## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:18-cv-00106-RJC-DSC

MALCOLM WIENER,     )
    )
    Plaintiff,     )
    )
    v.     )
    )     <u>ORDER</u>
AXA EQUITABLE LIFE INSURANCE     )
COMPANY,     )
    )
    Defendant.     )
_____)

**THIS MATTER** comes before the Court on Defendant's Motion for Summary

Judgment. (Doc. No. 43.)

## I.    BACKGROUND

Defendant is an insurance company and member of the Medical Information

Bureau ("MIB"), a corporation owned by its member life and health insurance

companies.   The MIB compiles information about insurance applicants that is

analogous to a credit report but for health history. (Doc. No. 48-5, at 4.) The MIB

serves as an information exchange in that its member companies contribute to the

MIB database information about insurance applicants that was obtained during the

underwriting process. (Doc. No. 49-5, at 3.)  When an individual applies for life

insurance with an MIB member company, the company notifies the individual that

the MIB may disclose the individual's MIB report, if any, to the company. (Doc. No.

49-5, at 3.)  The company also notifies the individual that it may report information

it obtains regarding the individual's medical conditions to the MIB. (Doc. No. 49-5,

at 3.)  The member company then asks the individual to sign an authorization allowing the company to use the MIB as an information source.  (Doc. No. 49-5, at 3.)

When an MIB member completes the underwriting of an insurance application, it must report to the MIB information involving impairments listed in the MIB coding manual that it obtained during its underwriting of the individual's application.  (Doc. No. 45-5, at 13–14.)  Such information is reported using six-digit MIB codes signifying different medical impairments and conditions, diagnostic test results, and other conditions affecting the insurability of the applicant.  The first three digits in the code signify the impairment or condition.  (Doc. No. 45-7, at 281:1–2.)  That a certain condition or impairment is reported, however, means only that the reporting member obtained evidence of the condition or impairment during the underwriting process; it does not signify a confirmed diagnosis.  (See Doc. No. 45-3, at 48:2–8; Doc. No. 49-5, at 3.)  The fourth digit signifies the degree of the impairment and, at least for some impairments, whether it is treated or untreated.  (Doc. No. 45-7, at 280:7–16, 281:2–13.)  The fifth digit signifies the source of the information, and the sixth digit signifies the duration of the impairment.  (Doc. No. 45-7, at 281:4–7.)  Any codes reported by an MIB member about an applicant are maintained in MIB's database and are available to other MIB members who obtain the applicant's authorization to use the MIB as an information source.  (Doc. No. 49-5, at 3.)

In 1986 and 1987, Plaintiff purchased from Defendant three life insurance policies with a total face value of $16 million.  (Doc. No. 1-2, at Exs. A–C.)  The policies were universal life insurance policies that were to stay in effect throughout Plaintiff's

life provided that the conditions of the policies were met.  (Doc. No. 1-2, ¶ 11; Doc. No. 9, ¶ 11.)  Plaintiff has paid over $3 million in premiums under the policies.  (Doc. No. 1-2, ¶ 20; Doc. No. 9, ¶ 20.)

On December 2, 2013, Defendant notified Plaintiff by letter that the policies had terminated for lack of payment but could be reinstated subject to Defendant's approval.[1]  (Doc. No. 1-2, at Ex. D.)  Defendant directed Plaintiff to complete and submit the enclosed reinstatement applications if he sought to reinstate the policies. (Doc. No. 1-2, at Ex. D.)

On December 23, 2013, Plaintiff submitted the reinstatement applications along with the materials required by Defendant for medical evidence of insurability. (Doc. No. 1-2, ¶ 26; Doc. No. 9, ¶ 26.)  These materials included an authorization for Defendant to communicate with Plaintiff's physician regarding Plaintiff's health and a release granting Defendant access to all information, including the MIB, regarding Plaintiff's past, present, or future physical or mental condition.  (Doc. No. 1-2, ¶¶ 46–47; Doc. No. 9, ¶¶ 46–47; Doc. No. 48-1, at Ex. 61.)   Plaintiff further acknowledged that information may be disclosed to the MIB who in turn may disclose such information to another MIB member with whom Plaintiff applies for life insurance. (Doc. No. 48-1, at Ex. 61.)

Hallie Hawkins was assigned to underwrite Plaintiff's reinstatement applications on behalf of Defendant.  (Doc. No. 1-2, ¶ 29; Doc. No. 9, ¶ 29.)  As part of

---

[1] The termination of the policies is the subject of an earlier lawsuit pending in the Southern District of New York.  Wiener v. AXA Equitable Life Insurance Co., No. 1:16-cv-04019-ER.

her underwriting, Hawkins requested Plaintiff's medical records from Plaintiff's treating physician, Dr. Barry Boyd. (Doc. No. 1-2, ¶ 30; Doc. No. 9, ¶ 30.) Dr. Boyd provided the requested medical records and asked to speak with the underwriter. (Doc. No. 48-1, at Ex. 71; Doc. No. 48-7, at 3.) Henry Lewer, Defendant's Senior Director, and Sandra Huffstetler, a Lead Associate, directed Hawkins to contact Dr. Boyd regarding Plaintiff's reinstatement applications. (Doc. No. 48-1, at Ex. 71.) Despite that directive, Hawkins never contacted Dr. Boyd. (Doc. No. 48-1, at 253:9–18; Doc. No. 48-7, at 3.) Based on her review of Dr. Boyd's medical records, Hawkins directed Huffstetler to report seven MIB codes regarding Plaintiff, six of which are at issue in this litigation. (Doc. No. 48-1, at Ex. 71.) The six MIB codes at issue signified the following conditions, all of which were coded to reflect that the information was obtained from a doctor:

- Atrial fibrillation: Details (including the degree, whether it was treated or untreated, and duration) unknown. (Doc. No. 45-7, at 280:18–281:1.)

- Suspected cerebral vascular accident: Details unknown. (Doc. No. 45-7, at 283:17–284:8.)

- High blood pressure: Details (including the degree, whether it was treated or untreated, and duration) unknown. (Doc. No. 45-7, at 280:7–16.)

- Suspected memory loss: Details unknown. (Doc. No. 45-7, at 284:21–22.)

- Monoclonal gammopathy of uncertain significance ("MGUS"): Details (including the degree and duration) unknown. (Doc. No. 45-7, at 284:10–13.)

- Sleep apnea: Details (including the degree and duration) unknown. (Doc. No. 45-7, at 283:5–15.)

4

Defendant notified Plaintiff by letter dated March 24, 2014 that his reinstatement applications were declined. (Doc. No. 1-2, at Ex. E.)

Shortly after Defendant declined his reinstatement applications, Plaintiff contacted Sanford Robbins of American Business, an insurance brokerage company. (See Doc. No. 48-4, at 7:8–19.) In or about April 2014, Robbins submitted on Plaintiff's behalf an informal application for life insurance to John Hancock, Principal Life Insurance Company, and Security Mutual Life Insurance Company of New York. (Doc. No. 48-4, at 20:21–21:3, 23:6–25, 26:25–27:19.) John Hancock reviewed Plaintiff's medical records and declined his application. (Doc. No. 48-4, at 20:24–23:5.) Principal Life Insurance Company reviewed Plaintiff's medical records and tentatively approved his informal application at a Table 4 rating, which is double the standard rate, subject to a full underwriting and MIB check upon receipt of a formal application. (Doc. No. 48-4, at 23:6–24:13.) Unlike John Hancock and Principal Life Insurance Company, Security Mutual obtained and reviewed Plaintiff's MIB file in addition to Plaintiff's medical records. (Doc. No. 48-4, at 27:23–28:13.) Security Mutual tentatively approved Plaintiff's application at a Table 4 rating. (Doc. No. 48-4, at 28:15–22.) Plaintiff did not submit additional records to Principal Life Insurance Company or Security Mutual because the offered rating was too costly. (See Doc. No. 48-4, at 25:8–20.)

On January 25, 2018, Plaintiff filed his Complaint in the Superior Court of Mecklenburg County, North Carolina, and Defendant subsequently removed the action to the United States District Court for the Western District of North Carolina.

5

Plaintiff alleges that Defendant failed to exercise reasonable care in assessing Plaintiff's medical history and conditions and reporting such information to the MIB. Based thereon, Plaintiff asserts claims for negligent misrepresentation, libel, negligence, and unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1.

On January 24, 2020, Defendant filed its Motion for Summary Judgment. The motion has been fully briefed and is now ripe for adjudication.[2]

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quotation marks omitted). This "burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that

---

[2] Due to the COVID-19 global pandemic, the Court decides the motion without oral argument.

there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325.

Once this initial burden is met, the burden shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250. The nonmoving party may not rely upon mere allegations or denials of allegations in the pleadings to defeat a motion for summary judgment; rather, it must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 248; <u>accord</u> <u>Sylvia Dev. Corp. v. Calvert Cty.</u>, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences therefrom in the light most favorable to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. <u>Anderson</u>, 477 U.S. at 248–49. "If the evidence is merely colorable or is not significantly probative," summary judgment is appropriate. <u>Id.</u> at 249–50 (citations omitted).

## III. DISCUSSION

### A. Negligent Misrepresentation

North Carolina has adopted the definition of negligent misrepresentation set forth in the Restatement (Second) of Torts under which

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by

7

their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Lamb v. Styles, 824 S.E.2d 170, 177 (N.C. Ct. App. 2019) (quoting Restatement (Second) of Torts § 552 (1977)). Thus, the "tort of negligent misrepresentation occurs when (1) a party justifiably relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care." Laschkewitsch v. Lincoln Life & Annuity Distribs., 47 F. Supp. 3d 327, 335 (E.D.N.C. 2014) (quoting Brinkman v. Barrett Kays & Assocs., P.A., 575 S.E.2d 40, 43–44 (N.C. Ct. App. 2003)). To establish justifiable reliance, plaintiff must prove that it directly relied on false information supplied by defendant. Cincinnati Ins. Co. v. Centech Bldg. Corp., 286 F. Supp. 2d 669, 683 (M.D.N.C. 2003). North Carolina has "rejected the concept of indirect reliance or 'reliance by proxy' for purposes of common law misrepresentation claims." NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd., 820 S.E.2d 322, 330 (N.C. Ct. App. 2018); Hernandez v. Coldwell Banker Sea Coast Realty, 735 S.E.2d 605, 614 (N.C. Ct. App. 2012) (stating that justifiable reliance requires actual reliance on the information in the report supplied by defendant, "not reliance via a third party"); Hospira Inc. v. AlphaGary Corp., 671 S.E.2d 7, 12 (N.C. Ct. App. 2009) ("[U]nder a theory of negligent misrepresentation, liability cannot be imposed when the plaintiff does not directly rely on information prepared by the defendant, but instead relies on altered information provided by a third party.").

Here, the theory underlying Plaintiff's negligent misrepresentation claim is

that Defendant supplied inaccurate codes to the MIB regarding Plaintiff's medical history.  There are neither allegations nor evidence that Plaintiff directly relied on the MIB codes reported by Defendant.  In fact, Plaintiff did not even become aware of the MIB codes reported by Defendant until October 24, 2017—only three months before Plaintiff filed this lawsuit.  (Doc. No. 49-5.)  Even assuming that the MIB codes were false, the absence of direct reliance by Plaintiff on the MIB codes reported by Defendant is fatal to Plaintiff's negligent misrepresentation claim.  <u>Cincinnati Ins. Co.</u>, 286 F. Supp. 2d at 682–83 (granting summary judgment in favor of defendant on plaintiff's negligent misrepresentation claim where plaintiff claimed that it was injured as a result of third parties' reliance on information supplied by defendant but there was no evidence that plaintiff directly relied on information supplied by defendant); <u>Hospira Inc.</u>, 671 S.E.2d at 12 (affirming summary judgment in favor of defendant on plaintiff's negligent misrepresentation claim where there was no evidence that plaintiff directly relied on defendant's statements); <u>Brinkman</u>, 575 S.E.2d at 44 (same).  Therefore, the Court grants summary judgment in favor of Defendant on Plaintiff's negligent misrepresentation claim.

### B.   Libel

"In North Carolina, the term defamation applies to the two distinct torts of libel and slander."  <u>Boyce & Isley v. Cooper</u>, 568 S.E.2d 893, 898 (N.C. Ct. App. 2002).  "Libel is any false written publication to a third party; whereas, slander is a false oral communication which is published to a third party."  <u>Cummings v. Lumbee Tribe</u>, 590 F. Supp. 2d 769, 774 (E.D.N.C. 2008).  To recover for either libel or slander,

"plaintiff generally must show that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." Desmond v. News & Observer Publ. Co., 772 S.E.2d 128, 135 (N.C. Ct. App. 2015).

Defendant argues that summary judgment in its favor is warranted because the MIB codes it reported were accurate and, thus, Plaintiff cannot establish that Defendant made a false statement of or concerning Plaintiff. The Court discusses the six reported MIB codes in turn.

### 1.    Atrial Fibrillation

Hawkins reported that Plaintiff's medical records contain evidence of atrial fibrillation, but that she did not have enough information to report the degree, whether it was treated or untreated, or the duration. (Doc. No. 45-7, at 280:18–281:1.) Plaintiff's medical records are replete with references to and notes regarding Plaintiff's atrial fibrillation. (Doc. No. 45-9, at 2–5, 7, 9, 11, 13, 16, 18, 20–22.) In fact, Plaintiff does not dispute that he suffers from atrial fibrillation, but instead contends that it is well controlled with medication. While any treatment of Plaintiff's atrial fibrillation is relevant to the reasonableness of Hawkins' assessment of Plaintiff's medical history and consequent reporting for purposes of Plaintiff's negligence claim, discussed below, it does not save Plaintiff's libel claim, which requires a false statement. See Craven v. SEIU COPE, 656 S.E.2d 729, 732 (N.C. Ct. App. 2008) (stating that a defamatory statement must be false in order to be actionable). Using MIB codes, Hawkins accurately reported that Plaintiff's medical

records contain evidence of atrial fibrillation. Thus, Plaintiff's libel claim may not be based on Hawkins' report of atrial fibrillation. See Goddard v. Protective Life Corp., 82 F. Supp. 2d 545, 561 (E.D. Va. 2000) (granting summary judgment in favor of defendants on plaintiff's defamation claim where the code reported to the MIB by defendants was accurate at the time it was made).

### 2. Suspected Cerebral Vascular Accident

Plaintiff's medical records contain a note by Dr. Boyd that reads "Hx CVA," which is short for history of cerebral vascular accident. (Doc. No. 45-9, at 8; Doc. No. 45-7, at 283:19–25.) Based on this note, Hawkins reported a suspected cerebral vascular accident but was unable to report additional details. (Doc. No. 45-7, at 196:2–18, 283:17–284:8.) Unlike the code for Plaintiff's atrial fibrillation, Hawkins coded Plaintiff's cerebral vascular accident as suspected. (Doc. No. 45-7, at 283:23–284:2.) Plaintiff does not argue that Hawkins did not in fact suspect a cerebral vascular accident, thereby rendering her statement false. Instead, Plaintiff essentially contests the reasonableness of Hawkins' assessment and reporting of a suspected cerebral vascular accident based on the entirety of the medical records. As Plaintiff has failed to come forward with any evidence that Hawkins' report of a suspected cerebral vascular accident was false, such report may not serve as a basis for Plaintiff's libel claim.

### 3. High Blood Pressure

Hawkins reported that Plaintiff's medical records contain evidence of high blood pressure, but that she did not have enough information to report the degree,

whether it was treated or untreated, or the duration. (Doc. No. 45-7, at 280:7–16.) As with Plaintiff's atrial fibrillation, the medical records are replete with references to and notes regarding Plaintiff's hypertension. (Doc. No. 45-9, at 2–5, 7, 11, 13, 16, 18, 20, 22.) Plaintiff does not dispute that the records contain evidence of Plaintiff's hypertension, but instead argues that Hawkins should have coded the hypertension as treated based on other information in the medical records. As Plaintiff has failed to come forward with any evidence that Hawkins' report of high blood pressure was false, such report may not serve as a basis for Plaintiff's libel claim.

### 4. Suspected Memory Loss

Hawkins reported suspected memory loss but was unable to report additional details. (Doc. No. 45-7, at 284:21–22.) Plaintiff's medical records contain numerous references to and notes regarding Plaintiff's memory loss. (Doc. No. 45-9, at 2–5, 7–13, 15–22.) Plaintiff has failed to come forward with any evidence that Hawkins' report of suspected memory loss was false. Therefore, Plaintiff's libel claim may not be based on Hawkins' report of the same.

### 5. MGUS

Hawkins reported that Plaintiff's medical records contain evidence of MGUS, but that she did not have enough information to report additional details, including the degree or duration. (Doc. No. 45-7, at 284:10–13.) Plaintiff's medical records contain repeated references to and notes regarding Plaintiff's MGUS. (Doc. No. 45-9, at 9–13, 15–16, 18–22.) Plaintiff contends that the medical records also reference test results tending to show Plaintiff does not have MGUS. As discussed above, that

12

a condition such as MGUS is reported to the MIB signifies only that the records contain evidence of MGUS—it does not signify a confirmed diagnosis. (See Doc. No. 45-3, at 48:2–8; Doc. No. 49-5, at 3.) As the medical records frequently refer to Plaintiff's history and diagnosis of MGUS, Plaintiff may not recover for libel based on Hawkins' report of the same. Whether Hawkins should have obtained test results referenced in the medical records and consulted with Dr. Boyd prior to reporting MGUS to the MIB does not save Plaintiff's libel claim.

      6.    <u>Sleep Apnea</u>

Hawkins reported that Plaintiff's medical records contain evidence of sleep apnea, but that she did not have enough information to report additional details, including the degree or duration. (Doc. No. 45-7, at 283:5–15.) Plaintiff's medical records document a history of sleep apnea, (Doc. No. 45-9, at 2–3, 19), and Plaintiff does not dispute this. As Plaintiff has not come forward with any evidence showing that Hawkins' statement that Plaintiff's medical records contain evidence of sleep apnea is false, Plaintiff may not recover for libel based on such statement.

\*     \*     \*

In short, Plaintiff has failed to come forward with sufficient evidence that Hawkins' statements to the MIB regarding the conditions evidenced by the medical records were false. Therefore, the Court grants summary judgment in favor of Defendant on Plaintiff's libel claim. See <u>Goddard</u>, 82 F. Supp. 2d at 561 (granting summary judgment in favor of defendants on plaintiff's defamation claim where the code reported to the MIB by defendants was accurate at the time it was made).

### C.    Negligence

Defendant contends that the accuracy of the MIB codes also warrants summary judgment in its favor on Plaintiff's negligence claim. The Court disagrees. While a libel claim necessarily requires Plaintiff to prove Defendant made a false statement of or concerning Plaintiff, a negligence claim does not. <u>Strawbridge v. Sugar Mt. Resort, Inc.</u>, 320 F. Supp. 2d 425, 434 (W.D.N.C. 2004) ("To prevail on a negligence claim in North Carolina, a plaintiff must establish that 1) the defendant owed the plaintiff a duty of care, 2) the defendant breached that duty, 3) the plaintiff suffered damages, and 4) the damages were proximately caused by the defendant's breach."). Unlike Plaintiff's libel claim, which is based on the alleged falsity of the reported MIB codes, Plaintiff's negligence claim is based on the alleged unreasonableness of Hawkins' assessment of and consequent reporting to the MIB of Plaintiff's medical history. Viewing all the evidence and the inferences therefrom in the light most favorable to Plaintiff, there is sufficient evidence that Hawkins failed to comply with the industry standard of care in her assessment and reporting of Plaintiff's medical history to create a genuine dispute of fact.

As a general matter, Dr. Boyd specifically requested to speak with the underwriter handling Plaintiff's reinstatement applications, and Lewer and Huffstetler directed Hawkins to contact Dr. Boyd. (Doc. No. 48-1, at Ex. 71; Doc. No. 48-7, at 3.) Hawkins testified that doctors have called her regarding other applications and, in response, she would set up an appointment with Defendant's medical director during which they would both call the doctor. (Doc. No. 48-1, at

14

253:4–7.) Lynn Patterson, Defendant's expert, also stated that if the applicant's physician requests to talk to an underwriter directly, the calls are usually referred to the medical director for a doctor-to-doctor discussion. (Doc. No. 45-5, at 13.) Still, Hawkins did not reach out to the medical director or Dr. Boyd regarding Plaintiff's reinstatement applications and reported information to the MIB based solely on her review of the medical records. (Doc. No. 48-1, at 253:9–18; Doc. No. 48-7, at 3.) Viewing all the evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that in assessing and reporting Plaintiff's medical history, Hawkins did not comply with the industry standard of care by failing to attempt to communicate with the medical director or Dr. Boyd given that (a) Dr. Boyd requested to speak with Hawkins, (b) two employees directed Hawkins to contact Dr. Boyd, (c) when doctors have called Hawkins in the past regarding other applications, she and the medical director would contact the doctors, and (d) in the industry, calls from doctors requesting to speak with the underwriter are usually referred to the medical director.

The evidence regarding at least four of the reported conditions further supports the conclusion that a reasonable juror could conclude that Hawkins did not comply with the industry standard of care in assessing and reporting Plaintiff's medical history. With respect to Plaintiff's atrial fibrillation, Hawkins reported that she did not have enough information to report whether it was treated or untreated. (Doc. No. 45-7, at 280:18–281:1.) Dr. Boyd's medical records, however, reflect that Plaintiff's atrial fibrillation was treated with Pradaxa, an anticoagulant medication. (Doc. No.

48-1, at AXA 002470–71; Doc. No. 45-9, at 9–13, 16, 18, 20.) Defendant itself makes this point in arguing that Plaintiff's medical records support Defendant's report of atrial fibrillation, citing to the portion of the medical records indicating Plaintiff was prescribed anticoagulant medication. (Doc. No. 45, at 10.) During her deposition, Hawkins testified that the reference in the medical records to Pradaxa "really caught [her] eye" and explained that it is an anticoagulant that Plaintiff may be taking for his atrial fibrillation. (Doc. No. 45-7, at 145:3–11.) Still, Hawkins later testified and reported to the MIB that she did not have enough information to determine whether Plaintiff's atrial fibrillation was treated or untreated. (Doc. No. 45-7, at 280:18– 281:1.) From this evidence, a reasonable juror could conclude that Hawkins did not comply with the standard of care in failing to report Plaintiff's atrial fibrillation as treated.

Similarly, Hawkins reported that she did not have enough information to report whether Plaintiff's high blood pressure was treated or untreated. (Doc. No. 45-7, at 280:7–16.) During her deposition, however, Hawkins specifically noted the hypertension medication in the medical records and stated she "assumed that [Plaintiff] would be on that." (Doc. No. 45-7, at 145:3–5.) Indeed, in its brief, Defendant raises the fact that Plaintiff was prescribed medication for his hypertension, citing to the medical records and Hawkins' deposition. (Doc. No. 45, at 10.) Hawkins also noted multiple blood pressure readings in the medical records that were indicative of well controlled hypertension. (Doc. No. 45-7, at 170:7–11, 174:14– 17, 179:7–9.) From this evidence, a reasonable juror could conclude that Hawkins

did not comply with the standard of care in failing to report Plaintiff's hypertension as treated.

In addition, Hawkins reported a suspected cerebral vascular accident, or a stroke, based on a single notation that read "Hx CVA."[3] (Doc. No. 45-9, at 8; Doc. No. 45-7, at 196:2–18, 283:17–284:8.) Dr. Boyd testified that he should have put a question mark next to that note or written "possible CVA" as the note "was not a diagnosis but rather a typical note reflecting the need to rule out any structural abnormality in light of concurrent recent events." (Doc. No. 48-8, at 72:10–23; Doc. No. 48-7, at 2–3.) Dr. Boyd subsequently ordered a CT scan that was negative for a stroke. (Doc. No. 48-7, at 2–3; Doc. No. 48-8, at 72:4–9, 73:6–17.) Had Hawkins spoken to Dr. Boyd, she would have had the benefit of this information.

Notwithstanding Hawkins' failure to speak to Dr. Boyd, there is also evidence to suggest that Hawkins did not comply with the standard of care in reporting a suspected stroke based on the entirety of the medical records, even with the notation of history of a cerebral vascular accident. Dr. Boyd testified that a neurologic exam showing focal abnormalities constitutes medical proof of a stroke and the medical records noted multiple times that Plaintiff had no focal findings. (Doc. No. 48-8, at 72:4–8.) Dr. Boyd further testified that if Plaintiff had a stroke, it certainly would

---

[3] Defendant argues that that Hawkins based her report on other evidence in the medical records indicative of a cerebral incident, such as low albumin levels and difficulty speaking. Hawkins, however, testified that the single notation of history of a cerebral vascular accident was the only reference in the records to a cerebral vascular accident and there was no other indication of a stroke in Plaintiff's medical records. (Doc. No. 45-7, at 196:2–18.)

17

have been noted in every subsequent medical history. (Doc. No. 48-7, at 2–3; Doc. No. 48-8, at 71:5–72:3, 73:18–74:6.) And Ori Ben-Yehuda, an expert for Plaintiff, stated that the medical records do not support a finding that Plaintiff suffered a stroke, noting that the records contain no documentation of any neurologic deficit or any imaging report suggestive of a stroke. (Doc. No. 48-6, at 7.)

With respect to MGUS, the medical records reflect that Dr. Boyd ordered a serum immune electrophoresis ("SIEP"), a blood test, that was negative for significant gammopathy. (Doc. No. 45-9, at 15; Doc. No. 48-6, at 6.) Ben-Yehuda opined that the SIEP "revealed no evidence of a monoclonal spike (the prerequisite for MGUS) and hence [Plaintiff] categorically does not have MGUS." (Doc. No. 48-6, at 6.) In his expert report, Dr. Boyd stated that despite notes of MGUS in Plaintiff's medical history, his "repeated notes indicate the failure to document the presence of a monoclonal protein and clearly ruled out any MGUS during the period in question." (Doc. No. 48-7, at 4.) Hawkins did not obtain a copy of the SIEP test results or attempt to speak to Dr. Boyd. Viewing this evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that Hawkins failed to comply with the standard of care in her assessment and consequent reporting of MGUS based solely on the medical records.

In short, although there is some objective information in the medical records to support the reported conditions, there is sufficient evidence that Hawkins did not comply with the industry of standard of care in assessing and reporting Plaintiff's medical history to create a genuine dispute of fact.

18

Defendant also argues that the MIB codes did not render Plaintiff uninsurable and, thus, Plaintiff cannot establish causation or damages. Defendant points to MIB General Rule D.4, which prohibits member companies from taking adverse action based solely on an unverified MIB report without an independent investigation. (Doc. No. 45-5, at 11.) Adverse action is considered a declination, postponement, special class rating, an offer different than applied for, or an incomplete close out. (Doc. No. 45-5, at 11.) In the industry, "unverified" means that a member receives an MIB code alert from a reporting member and the receiving member has not yet done its own independent investigation to confirm the accuracy of the reported code. (Doc. No. 45-5, at 11.) Despite this rule, Stephen Burgess, Plaintiff's expert, testified that underwriters frequently review MIB reports early in the process and oftentimes will decline to initiate the underwriting process when there are multiple significant codes in an MIB report. (Doc. No. 48-3, at 53:4–54:8, 55:3–18, 133:5–13, 159:2–160:17; Doc. No. 48-5, at 4.) Therefore, there is a genuine dispute of fact as to whether the MIB codes effectively rendered Plaintiff uninsurable or insurable at a significantly increased cost.

Last, Defendant argues that it is entitled to summary judgment because Plaintiff failed to mitigate his damages. "Under the law in North Carolina, an injured plaintiff must exercise reasonable care and diligence to avoid or lessen the consequences of the defendant's wrong." Blakeley v. Town of Taylortown, 756 S.E.2d 878, 884 (N.C. Ct. App. 2014). "Unlike a plaintiff's failure to establish the element of proximate cause, the failure to mitigate damages is not an absolute bar to all

recovery; rather, a plaintiff is barred from recovering for those losses which could have been prevented through the plaintiff's reasonable efforts." <u>Smith v. Childs</u>, 437 S.E.2d 500, 507 (N.C. Ct. App. 1993). In other words, "[f]ailure to minimize damages does not bar the remedy; it goes only to the amount of damages recoverable." <u>United Lab. v. Kuykendall</u>, 403 S.E.2d 104, 108 (N.C. Ct. App. 1991). "As with other defenses, the burden is on defendant to show plaintiff neglected to mitigate damages." <u>Smith</u>, 437 S.E.2d at 507.

Here, any failure to mitigate by Plaintiff operates as defense only to the amount of damages. Defendant bears the burden of proving the amount of losses that Plaintiff could have prevented through reasonable efforts. Defendant has not established that Plaintiff could have reasonably prevented all losses and, thus, summary judgment in Defendant's favor is not appropriate on this basis.

### D. Unfair or Deceptive Acts or Practices

Plaintiff's last claim is for unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1. "[I]n order to establish a violation of [section 75-1.1], a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." <u>Walker v. Fleetwood Homes of N.C., Inc.</u>, 653 S.E.2d 393, 399 (N.C. 2007). "The determination as to whether an act is unfair or deceptive is a question of law for the court." <u>Dalton v. Camp</u>, 548 S.E.2d 704, 711 (N.C. 2001). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." <u>Hills Mach. Co.,</u>

LLC v. Pea Creek Mine, LLC, 828 S.E.2d 709, 716 (N.C. Ct. App. 2019) (quoting Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981)). "[A] practice is deceptive if it has the capacity or tendency to deceive." Walker, 653 S.E.2d at 399 (alteration in original) (quoting Marshall, 276 S.E.2d at 403).

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that there is insufficient evidence that Defendant committed an unfair or deceptive act to create a genuine dispute of fact. Any failure by Defendant to comply with the industry standard of care in assessing and reporting Plaintiff's medical history in this case is not deceptive, immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. The Court grants summary judgment in favor of Defendant on Plaintiff's claim for unfair or deceptive acts or practices.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, (Doc. No. 43), is **GRANTED in part** and **DENIED in part**. The motion is granted as to Plaintiff's claims for negligent misrepresentation, libel, and unfair or deceptive acts or practices, and such claims are **DISMISSED with prejudice**. The motion is denied as to Plaintiff's claim for negligence, and that claim shall proceed to trial.

21

Signed: June 4, 2020

Robert J. Conrad, Jr.
United States District Judge