# In the Matter Of:

## WIENER vs AXA EQUITABLE LIFE INSURANCE

CV-106-RJC-DSC

---

## SANFORD ROBBINS

*January 27, 2020*

---

$\bigcirc$ = overruled

S = sustained

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 1 of 66
Case 3:18-cv-00106-RJC-DSC   Document 81-3   Filed 03/27/20   Page 1 of 122

```
 1                        Robbins
 2    those policies were previously in place with
 3    AXA Equitable or any of the AXA affiliates?
 4            A.    I was aware that they were
 5    previously in place because I was told that.
 6            Q.    Do you in your professional work,
 7    do you work with AXA?
 8            A.    I do.
 9            Q.    Do you place policies with them?
10            A.    I do.
11            Q.    I guess more broadly, are you
12    familiar with AXA's underwriting policies and
13    procedures?
14            A.    Completely.
15            Q.    Are you familiar with other
16    companies' underwriting policies and
17    procedures?
18            A.    Yes.
19            Q.    Do you find that AXA's underwriting
20    policies and procedures differ from any other
21    companies that you're aware of, significantly?
22            MR. CASSOT:    Objection to the
23            form.
24            MR. TRAYNUM:    That's just an
25            objection for the record.  A judge will
```

OBJECTION
relevance
(see dkt 72)

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 9 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 3 of 122

```
1                        Robbins
2           decide whether that objection stands.
3           So we will need your answer regardless.
4           Now, whether or not anyone hears that
5           will depend on what the judge has to
6           say.
7           A.   I do find their underwriting
8    tougher than the average company.
9           Q.   What you do you mean by "tougher"?
10          A.   When applying for life insurance
11   they are more likely to provide lower or not
12   as favorable rating classifications as other
13   companies might provide on the same insured.
14          Q.   Is there anything about that that
15   you believe is inappropriate?
16          A.   No.  I don't believe there is
17   anything inappropriate.
18          Q.   Now, in terms of what you were
19   tasked to do or -- that's the wrong word.
20   Tell me what you understood the Wieners were
21   asking you to do when you were referred to
22   them or they were referred to you.
23          A.   I believe they were asking me to
24   secure insurance for them to replace the
25   policies that they could not reinstate.
```

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 10 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 4 of 122

```
 1                     Robbins
 2   something in.  Is that related to Mr. Wiener?
 3          A.   It's exactly the same thing you had
 4   already.  There's no other -- there was
 5   nothing else.
 6          Q.   Okay.  So I have right now as
 7   Exhibit B is every document that you're aware
 8   of that you have related to Mr. Wiener's file?
 9          A.   That's correct.
10          Q.   Let's go through these and we may
11   be done.
12              The first page of Exhibit B -- and,
13   again, these are three separate pages.  I
14   don't mean to suggest that this is all one
15   documents.  These are three separate
16   documents; is that accurate?
17          A.   That's correct.
18          Q.   And I've just attached them
19   together and labeled them as Exhibit B for
20   convenience.
21              So the first page of Exhibit B, can
22   you tell me what that is, what that
23   communication is?
24          A.   This a declination of an
25   application, something called an informal
```

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 21 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 5 of 122

1                           Robbins

2    application to John Hancock which they advised

3    Mr. Wiener's been declined.

4            Q.    What is the difference between an

5    informal application and a formal application?

6            A.    Informal applications, the insured

7    does not sign an application for it to be

8    issued.  It's only used for the purpose of

9    underwriting to get a decision.  And then once

10   a decision is reached, the insured has an

11   option to accept at that pricing or not.

12           Q.    This first page, do you know who

13   carrier this is?

14           A.    John Hancock.

15           Q.    Are you familiar with John

16   Hancock's underwriting procedures?

Objection

Foundation;
relevance

17           A.    I am.

18           Q.    In terms of an informal

19   underwriting procedure, are you familiar with

20   what process they go through in order to

21   obtain an informal decision?

Objection

Foundation;
relevance

22           A.    I am.

23           Q.    What is that process?

24           A.    They review the medical records

objection

25   only and determine based upon the medical

Foundation;
relevance

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC    Document 84-1    Filed 06/24/20    Page 22 of 66
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 6 of 122

```
 1                      Robbins

 2      records whether they would approve, if they

 3      take it to the next step, which is to review

 4      the records from the Medical Information

 5      Bureau and the prescription records.

 6           Q.    So if I understand what you're

 7      saying, based on an informal review that's

 8      based on -- do you understand when they say

 9      "attending physician statement," is that

10      medical records?

11           A.    Yes.

12           Q.    To your understanding?

13           A.    That's what that is.

14           Q.    So those are the medical records

15      from the physician.  Those aren't MIB records?

16           A.    That's correct.

17           Q.    So this decision was based on the

18      medical records received from the physician?

19           A.    Correct.

20           Q.    And based on what your

21      understanding is they would not have done an

22      MIB request at the informal stage; is that

23      correct?

24           A.    That's correct.

25           Q.    So any of the decisions made by
```

Objection
Foundation
Lack of
personal
knowledge

Objection

Foundation;
Lack of
personal
knowledge

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 23 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 7 of 122

1                          Robbins

2      John Hancock were made based on the physician

3      records, not on anything they obtained from

4      the MIB, as far as you understand it?

5          A.    That's correct.

6              Q.    The second page, can you tell me

7      what carrier that would be?

8          A.    Principal Life.

9          Q.    Are you familiar with Principal's

10     underwriting processes?

11         A.    Yes, I am.

12             Q.    Are you familiar with how the

13     Principal would have undertaken -- first of

14     all.  I apologize.  What was John Hancock

15     underwriting's decision?

16         A.    They declined him.

17         Q.    Based on what?

18         A.    His medical records.

19         Q.    So then the second page then is the

20     Principal -- I'll ask that first.  Do you have

21     an understanding as to what the Principal's

22     decision was with respect to its informal

23     review?

24         A.    It's exactly the same as John

25     Hancock, how they review things.  They don't

Objection

Foundation;
lack of
personal
knowledge

Objection

Foundation;
relevance

Objection

Foundation;
relevance

Objection

23:24-24:6

Foundation; lack of
personal
knowledge; n
responsive

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC    Document 84-1    Filed 06/24/20    Page 24 of 66
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 8 of 122

1                          Robbins

2    go through the Medical Information Bureau

3    records until -- or the prescription records

4    until an application has been submitted for

5    legal reasons.  They're not allowed to do

6    that.

7              Their approval -- just so you know,

8    is a Table 4 rating, which is 200 percent of

9    the rate of standard.  It's basically double

10   the standard rate.

11        Q.   So in other words, twice as much,

12   costs twice as much.

13        A.   Costs twice as much.

14        Q.   As you understood it, what was the

15   reason that was given for that rating?

16        A.   The atrial fibrillation and

17   whatever they say here.  The -- I can't even

18   say the word -- gammopathy,

19   G-A-M-M-O-P-A-T-H-Y.

20        Q.   And actually its the monoclonal

21   gammopathy; is that right?  If you look under,

22   quote, "tentative NT/Table 4 (due to history

23   of atrial fibrillation and monoclonal

24   gammopathy)," correct?

25        A.   That's correct.

800.211.DEPO (3376)
EsquireSolutions.com
Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 25 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 9 of 122

```
1                    Robbins
2            And I remember this in speaking
3   with Principal, just to make this completely
4   clear.  They believe they would have been able
5   to improve the rating once we received the
6   other records from the doctors and the
7   colonoscopy from 2013.
8        Q.   Okay.  As far as you know, were
9   additional records provided to the Principal?
10       A.   They were not provided to Principal
11  based upon my conversations with Carolyn
12  because the cost would have been too high even
13  at a Table 2 or Table 3 rating.
14       Q.   So even if there was an
15  improvement, there was a decision made to
16  not --
17       A.   Correct.
18       Q.   -- provide additional records to
19  the Principal?
20       A.   Yes.
21       Q.   But it's your understanding that,
22  in fact, Mr. Wiener based on the Principal,
23  the Principal was willing to offer insurance.
24  It was just at a very high rate?
25       A.   Yes.
```

Objection

25:2-25:7

Hearsay

Objection

Hearsay

ESquireSolutions.com

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 26 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 10 of 122

```
 1                    Robbins

 2         Q.   So he was insurable, per the

 3   Principal?

 4         A.   Yes.

 5         Q.   Also on this documents it says,

 6   "All quotes are tentative and based on

 7   information received" -- I'm looking in the

 8   bold face at the middle of the page on the

 9   Principal one.

10         A.   Yes.

11         Q.   It says, "All the quotes are

12   tentative and are based on information

13   received.  This case will be fully

14   underwritten with an MIB check upon receipt of

15   a formal application packet."  Correct?

16         A.   That basis substantiates exactly

17   what I told you as to their rules and process

18   for approving insurance.

19         Q.   So, in other words, again, they

20   would not have done an MIB check until they've

21   already done the record review and already

22   made a determination that they would make a

23   tentative offer?

24         A.   That's correct.

25         Q.   And then the final one is April 9,
```

Objection

Foundation;
improper
characterization;
lack of personal
knowledge;
hearsay

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 27 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 11 of 122

1                          Robbins

2          2014.

3                    And just, again, do you know the

4      date -- and going back to the very first page,

5      and I apologize for moving us all over the

6      place, but do you know the approximate date of

7      the John Hancock decision?  There's nothing on

8      that page.

9          A.    It had to be April 2014.

10         Q.    Okay.

11         A.    Because they all came at the same

12     time.

13         Q.    And then the Principal decision,

14     that's dated April 15, 2014.  Does that sound

15     about right to you?

16         A.    Yes.

17         Q.    And then the Security Mutual Life

18     is April 9, 2014?

19         A.    Yes.

20         Q.    So that's about when you would have

21     received their decision?

22         A.    Yes.

23         Q.    Are you familiar with Security

24     Mutual's underwriting processes?

25         A.    Extremely.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 28 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 12 of 122

1                        Robbins

2            Q.    Are they similar to John Hancock

3     and the Principal's?

4            A.    They are not.

5            Q.    How are they different?

6            A.    I have a certain classification

7     with Security Mutual because of my years doing

8     this.  So when I submitted the application to

9     Security Mutual, I had Malcolm sign an MIB

10    authorization disclosure which went with this

11    application, and they pulled the Medical

12    Information Bureau file prior to the real

13    application.

14           Q.    Okay.

15           A.    This decision of Table 4 was based

16    upon the Medical Information Bureau coding.

17           Q.    And they were willing to offer a

18    Table 4?

19           A.    Yes.

20           Q.    So, again, is that the same issue

21    where the rate would have been twice as high?

22           A.    Correct.

23           Q.    But nonetheless he was insurable?

24           A.    Correct.

25           Q.    Per Security Mutual?

OBJECTION
l. 11-16
foundation,
lacks personal
knowledge

Objection

Foundation;lack of
personal knowledge;
improper
characterization;
improper expert
testimony



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 29 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 13 of 122

```
 1                    Robbins

 2         A.    That's correct.

 3         Q.    When you say that they pulled the

 4    Medical Information Bureau records, did they

 5    also pull medical records?

 6         A.    Yes.

 7         Q.    And do you know if the medical

 8    records in this case were reviewed by Security

 9    Mutual?

10         A.    They were.

11         Q.    So in addition to the MIB, they

12    also reviewed medical records?

13         A.    Yes.

14         Q.    When it says "minimum Table 4 to

15    possible decline range, subject to the usual

16    age/amount requirements to include the

17    following," and then it list four things after

18    that, what did you understand that to mean?

19         A.    It means the same things as the

20    other applications that they will have to -- a

21    real application has to be submitted.  They

22    have to pull the prescription records.  They

23    have to supply the case to reinsurance,

24    because unlike John Hancock and Principal,

25    Security Mutual will not hold the paper or
```

Objection

Foundation; lack of
personal knowledge;
hearsay; improper
characterization

Objection; foundation

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 30 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 14 of 122

```
 1                        Robbins
 2            A.   My role as a broker is to advocate
 3     on the role of the insured, which is different
 4     than an agent.
 5            Q.   Right.
 6            A.   Correct.
 7            Q.   Because the agent --
 8            A.   Works for the insurance carrier.
 9            Q.   And as the advocate for the
10     insured, in your career and your experience
11     how many carriers would you say you've placed
12     policies with in your career?
13            A.   25.
14            Q.   And how long have you been a life
15     insurance agent?
16            A.   37 years.
17            Q.    In your experience do any of those
18     insurance companies make their decisions
19     strictly on MIB codes in terms of underwriting
20     decisions without reviewing medical records?
21            A.   Some companies make decisions on
22     MIB codes and won't even look at medical
23     records if an MIB code is that bad.  I've had
24     many insureds over the years receive declines
25     before I even submit the business once they
```



OBJECTION
foundation,
lacks
personal
knowledge
relevance
(see dkt. 71)



800.211.DEPO (3376)
EsquireSolutions.com
Case 3:18-cv-00106-RJC-DSC    Document 84-1    Filed 06/24/20    Page 33 of 66
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 15 of 122

```
 1                    Robbins
 2    review the MIB code.
 3         Q.   Do you know if the MIB itself has
 4    rules that prevent that type of conduct on
 5    behalf of insurers?
 6              MR. CASSOT:   Objection to form.
 7         Q.   The question is if you know.
 8         A.   I don't know.
 9         Q.   Is John Hancock one of those
10    companies that will do that, as far as you
11    know?
12         A.   I don't know.
13         Q.   Well, to the extent that you've
14    received the three documents that we have, do
15    those documents indicate to you that the three
16    informal underwriting the decisions that were
17    made concerning the application made by Mr.
18    Wiener were based on medical record reviews?
19         A.   I believe all three were based on
20    medical record reviews.
21         Q.   And at least two of those did offer
22    insurance but at a high rate?
23         A.   Correct.
24         Q.   I have no further questions, sir.
25              Thank you.
```

Objection

Foundation; lack of
knowledge; non-
responsive

Objection

Improper
characterization

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 34 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 16 of 122

```
 1                    Robbins

 2   BY MR. TRAYNUM:

 3        Q.    Mr. Robbins, my name is Kerry

 4   Traynum.

 5        A.    Hi.

 6        Q.    I'm counsel for Malcolm Wiener in

 7   this case.  I have a few questions to start

 8   off with and then I might want to take a break

 9   and come back and ask a few more.

10             Just now you were talking about

11   that some companies will review MIB codes and

12   make a decision based on that.  Can you

13   explain when you've seen that happen in the

14   past?

15        A.    I've seen it happen where there's

16   been -- the MIB has been coded for alcohol

17   abuse, suicide attempts, heart attacks that

18   have not been disclosed, and previous

19   underwriting decisions of ratings and

20   declines.

21        Q.    If you would explain what you mean

22   by that very last category?

23        A.    The Medical Information Bureau

24   keeps records of all applications and

25   decisions that are reached on each
```

OBJECTION
p. 34:15-35-7
foundation,
lacks personal
knowledge
relevance
(see dkt. 71)



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 35 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 17 of 122

1                          Robbins

2     application.  So when an insured is declined

3     or rated on a previous application the Medical

4     Information Bureau knows this, and the

5     insurance company uses that information to aid

6     them in the decisionmaking process of a new

7     appl ication.

8              Q.   Now, you mentioned that you -- we

9     have these three written.  And you said that

10    you recall receiving other writings back

11    regarding Mr. Wiener at some point.  You just

12    don't have them anymore.

13              Do you recall how many companies

14    that you reached out to on behalf of Mr.

15    Wiener?

16              A.   I believe it was eight.

17              Q.   Do you remember any of the other

18    companies' names?

19              A.   I believe at the time I went to

20    Voya, U.S. Life -- which is also AIG --

21    Prudential, Nationwide.  I'm not sure about

22    the others.

23              Q.   You're not sure if there were any

24    others?

25              A.   I'm not sure.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 36 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 18 of 122

1                       Robbins

2          Q.    Just from your memory do you recall

3    any decisions or the substance of any

4    communications you received back from these

5    four companies that you've identified?

6          A.    I believe there was nothing

7    favorable.

8          Q.    Do you recall if any of these had

9    received medical records or reviewed MIB

10   codes?

                                    Objection

                                    Foundation; lack of
                                    personal knowledge

11         A.    None of them reviewed MIB codes.

12   All of them received medical records.

13         Q.    What was the process by which these

14   companies, as well as the three in the

15   exhibits, received the medical records?

16         A.    The medical records were sent

17   electronically to Christina Torres who is on

18   this e-mail.  And she then, based upon the

19   companies I advised her to go to, submits the

20   file electronically to the carriers for

21   underwriting review.

22         Q.    Does Ms. Torres procure those

23   medical records directly from the physician?

24         A.    I do.

25         Q.    Okay.  If you'll look back at B, on

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 37 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 19 of 122

```
 1                    Robbins

 2     page 3, Security Mutual Life?

 3          A.    Yes.

 4          Q.    Mr. Cassot asked you some questions

 5     about the minimum Table 4 to possible decline

 6     range.  Is it fair to say this was not a final

 7     decision for coverage?

 8          A.    It was not a final decision.

 9          Q.    Were any of these three -- well,

10     the John Hancock was the decline.

11          A.    Correct.

12          Q.    That was final.

13          A.    That was final.

14          Q.    And then the Principal, that was a

15     preliminary decision, correct?

16          A.    It was a preliminary decision.  And

17     all the other companies that I've provided to

18     you were also declines.

19          Q.    Okay.  So out of the seven we've

20     identified, we had two preliminary decisions,

21     not final, and then the rest were declines?

22          A.    Correct.

23          Q.    Have you ever known of a company

24     who will decline to undertake an underwriting

25     decision based on any information they
```

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 38 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 20 of 122

```
 1                      Robbins
 2   received regarding potential insured?
 3           A.   I don't understand the question.
 4   So I think we need to rephrase that.
 5           Q.   In your experience have you ever
 6   known of a company rather than to undertake
 7   underwriting -- to undertake to make an
 8   underwriting decision, instead of doing that
 9   will just decline to make an underwriting
10   decision, to undertake that process?
11           A.   I don't think that -- I don't think
12   that could happen that way because I think the
13   insurance company has to review something to
14   make a decision that they don't want to see
15   it.  A company will not decline to underwrite
16   a piece of business without a reason.
17           Q.   Earlier you talked about when you
18   were talking about the Security Mutual, that
19   upon -- I think you said you had the MIB
20   waiver.
21           A.   I believe they pulled the Medical
22   Information Bureau records.
23           Q.   And I want to get your phrasing
24   right, that they declined or they issued --
25   excuse me.  They issued this decision before
```

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 39 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 21 of 122

                              Robbins

1
2    you ever sent the business?

3         A.    They issued that decision before

4    they pulled the pharmacy records and received

5    a real application.

6              MR. CASSOT:    Objection.

7         Q.    Did you ever have any

8    communications with any of the insurers you

9    contacted on behalf of Mr. Wiener regarding

10   MIB codes?

11        A.    I don't recall exactly what

12   happened, but I do recall that in speaking

13   with the insurance carriers I was told that

14   the Medical Information Bureau file had a

15   coding in it that created an underwriting

16   issue.

17        Q.    When you say "underwriting issue,"

18   what do you mean by that?

19        A.    Meaning to issue the policy at

20   standard without a rating.

21        Q.    Just for the record and for my

22   information, what do you mean by when you say

23   for "standard without a rating"?

24        A.    A standard policy would be the rate

25   that a typical person would obtain if they

OBJECTION
foundation,
lacks personal
knowledge
relevance
(see dkt. ̄

OBJECTION
foundation,
lacks personal
knowledge
relevance
(see dkt. 73)


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC    Document 84-1    Filed 06/24/20    Page 40 of 66
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 22 of 122

1                    Robbins

2    were healthy.  And someone that's Mr. Wiener's

3    age, that would be the goal.

4              There are better classifications

5    such as "preferred," but it would be

6    unrealistic to think that someone at that age

7    would obtain that.

8         Q.   Just so I'm understanding it, so

9    there was some type of feedback from at least

10   one of the companies?

11        A.   I think it was Security Mutual, but

12   I'm not sure --

13        Q.   Okay.

14        A.   -- that advised me that there was a

15   potential issue.

16        Q.   And ultimately they came back with

17   a decision minimum Table 4 to possible decline

18   range, pending these four other --

19        A.   Yes.

20        Q.   -- bullet points.

21              What does minimum Table 4 -- is

22   that the double the standard?

23        A.   That's double the standard as the

24   best rate possible.

25        Q.   Do you have any idea what in a

OBJECTION
foundation,
lacks personal
knowledge
relevance
(see dkt. 73)

OBJECTION
foundation,
lacks personal
knowledge
relevance
(see dkt. 73)
undisclosed
expert opinion

ESQUIRE
DEPOSITION SOLUTIONS

*800.211.DEPO (3376)*
*EsquireSolutions.com*
Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 41 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 23 of 122

```
 1                      Robbins

 2    dollar amount that would have equated to for

 3    the amount of insurance Mr. Wiener was

 4    seeking?

 5          A.    The standard rate was approximately

 6    400,000 per 10 million, and equated to an

 7    extra 400,000 per year.

 8              MR. TRAYNUM:    Let's take a short

 9         break.

10              (Recess.)

11          Q.    Mr. Robbins, we're back on the

12    record.  You're still under oath.  I just have

13    a few follow-up questions.

14                You mentioned that Mr. Wiener

15    provided an MIB waiver that you provided to

16    Security Mutual.

17          A.    He signed a HIPAA form --

18          Q.    Okay.

19          A.    -- which allows the company to

20    secure records.

21                I'm not even 100 percent sure that

22    Security Mutual pulled the MIB, but I do

23    recall that I had a conversation with the

24    underwriter there because I know them so well,

25    and I just don't recall the details.
```

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 42 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 24 of 122

```
 1                    Robbins
 2        Q.   Do you recall the name of that
 3   underwriter?
 4        A.   Keith Brown.
 5        Q.   And this HIPAA form, would that
 6   have been something that Mr. Wiener provided
 7   to you not -- as part of enabling you to
 8   obtain his records to provide the companies?
 9        A.   It was a package I would have given
10   him to sign.
11        Q.   My more specific question is:  This
12   was not something that you did specifically
13   for Security Mutual that you can recall?
14        A.   No.  No.  I don't think I did
15   something specific for Security Mutual.
16        Q.   And you mentioned earlier when we
17   were first talking about John Hancock and
18   going through your familiarity with their
19   underwriting guidelines and processes, that
20   they looked at physicians' records and not MIB
21   codes because of legal concerns?
22        A.   Right.  You can't -- some companies
23   believe they can't pull the Medical
24   Information Bureau records until a signed
25   application is presented.
```

**ESQUIRE**
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 43 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 25 of 122

1                        Robbins

2              Q.    So a formal application?

3              A.    Correct.

4              Q.    But not all companies operate like

5     that?

6              A.    Not all companies do that.

7              Q.    And you also mentioned that the MIB

8     database or the information available from the

9     MIB would include other -- history of other

10    declines?

11             A.    Yes, 100 percent of those.

12             Q.    So depending on the order in which

13    the -- the responses you got back from -- that

14    Mr. Wiener got back from the MIB, would that

15    -- or from the different companies, would that

16    be available from the MIB?

17             A.    No.  That's why these are all

18    informal.  That's one of the reasons I do

19    informals, because it doesn't affect or hurt

20    the client's or insured's MIB record.  Once a

21    real application is submitted, by law they're

22    required to file the codes with the MIB.

23             Q.    They're required by law to file the

24    MIB codes?

25             A.    They're required to notify the MIB



OBJECTION
foundation,
lacks personal
knowledge

*Esquire*Solutions.com
EsquireSolutions.com

800.211.DEPO (3376)
EsquireSolutions.com
Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 44 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 26 of 122

```
 1                    Robbins
 2   of their decisions.
 3          Q.    Okay.
 4          A.    And how the MIB codes it, I don't
 5   know.
 6          Q.    In terms of the decision -- let me
 7   ask you this.  Are you familiar in any way
 8   with AXA's decisions regarding Mr. Wiener's
 9   life insurance?
10          A.    I'm not.
11          Q.    Do you know if that would have been
12   reported to the MIB?
13          A.    I don't know how -- I don't know if
14   a reinstatement form was used for AXA.  If a
15   reinstatement form was used for AXA, it
16   definitely was reported to the MIB.  If it was
17   simply too late to reinstate, then it probably
18   wouldn't be.
19                MR. TRAYNUM:  That's all the
20          questions.
21   BY MR. CASSOT:
22          Q.    Just a couple of follow-ups.
23                How do you know that MIB gets
24   reports of underwriting decisions?
25          A.    I've seen it my entire career.
```

OBJECTION
foundation,
lacks personal
knowledge
relevance
(see dkt. 72)



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 45 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 27 of 122

                              Robbins

 1

 2       Q.    What's the code?

 3       A.    I have no idea what the codes are.

 4       Q.    What is it that you see that causes

 5   you to believe that --

 6       A.    I don't see anything.  I hear the

 7   insurance company tell me that the MIB was

 8   coded for this or coded for that.  I never

 9   know what the code is or what it means.

10       Q.    Okay.  And somebody has told you

11   the MIB has coded a decline?

12       A.    Many times.

13       Q.    Okay.

14       A.    I'm not talking specifically about

15   Mr. Wiener.  But many times, at least 50 in my

16   career, I've heard that and seen it.

17       Q.    And when someone is coded for a

18   decline, does that make it an automatic

19   decline for subsequent carriers?

20       A.    It makes it a harder underwriting

21   process because they need to do the research

22   as to why the decline occurred.

23       Q.    And that would include reviewing

24   MIB codes, correct?

25       A.    It would involve reviewing MIB

OBJECTION
foundation,
lacks personal
knowledge
undisclosed
expert opinion

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com
Case 3:18-cv-00106-RJC-DSC   Document 84-1   Filed 06/24/20   Page 46 of 66
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 28 of 122



ESQUIRE

12-12-2017

Attn: D. BARRY BOYD, M.D., MS
Re: **WIENER vs AXA EQUITABLE LIFE INSURANCE**
**Deposition of D. Barry Boyd, MD, MS, taken on 12/08/2017**
**Your Case Number 1:16-cv-04019-ER**
**Our Reference Number 742105**

Dear Sir or Madam:
Please be advised that the transcript in the above-referenced matter is available for reading and signature. Enclosed you will find a condensed copy of the transcript, a Declaration under Penalty of Perjury Certificate and Errata pages to note any necessary changes or corrections to the transcript. The Original transcript has already been released to the custodial party.

The witness should complete the following steps within 60 days of the date of this memorandum:

- Read the enclosed copy of the transcript of your deposition
- Make any corrections necessary on the Errata page only. If you do not wish to make changes, write "No Changes" on the top of the Errata page.
- If you require additional space to list changes, you may use your own paper. Remember to include witness name, deposition date, our reference number, and the page/line location of each change.
- If there are multiple transcript volumes, complete Errata pages separately for each volume.
- Sign the bottom of the Errata page(s)
- Sign and date the Declaration under Penalty of Perjury.
- Return only the Declaration under Penalty of Perjury and signed Errata pages. The condensed transcript is yours to keep.
- Return completed forms to:

  Errata Processing Division
  Esquire Corporate Production Department
  Suite 2700, 101 Marietta Street
  Atlanta, GA 30303

If electronic documents are permissible in the applicable venue for this matter, you may instead submit a scanned copy of the Declaration under Penalty of Perjury and signed Errata pages via E-mail to errata@esquiresolutions.com .

Upon our receipt of completed Errata pages, we will archive and make the changes available in electronic form to all counsel. After archiving we will forward the original Errata pages on to the custodial party, to be reunited with the original transcript.



In the event any of the above instructions differ from a stipulation or contradict a previous agreement between counsel regarding witness signature, please disregard this letter's details and follow the protocol as agreed upon by and between counsel.

If you have any other questions regarding this process, please contact Esquire Client Support at 800.211.DEPO (800.211.3376), or ClientCare@esquiresolutions.com .

Thank you,

Corporate Production Department
Esquire Deposition Solutions

Enclosures

Cc: All Counsel present

Ref: 742105

1   Reference No.: 742105

2

3   Case:  WIENER vs AXA EQUITABLE LIFE INSURANCE

4

        DECLARATION UNDER PENALTY OF PERJURY

5

        I declare under penalty of perjury that

6   I have read the entire transcript of my Depo-
    sition taken in the captioned matter or the

7   same has been read to me, and the same is
    true and accurate, save and except for

8   changes and/or corrections, if any, as indi-
    cated by me on the DEPOSITION ERRATA SHEET

9   hereof, with the understanding that I offer
    these changes as if still under oath.

10

11

12   _____
        D. Barry Boyd, MD, MS

13

14        NOTARIZATION OF CHANGES

15            (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)            Notary Public,

24

25   in and for the State of _____

ESQUIRE
800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-2   Filed 06/24/...
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 31 of 122

```
 1    Reference No.: 742105

      Case:  WIENER vs AXA EQUITABLE LIFE INSURANCE
 2

 3    Page No._____Line No._____Change to:_____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    Page No._____Line No._____Change to:_____

22    _____

23    Reason for change:_____

24

      SIGNATURE:_____DATE:_____

25    D. Barry Boyd, MD, MS
```

**ESQUIRE**                    800.211.DEPO (3376)
                               *EsquireSolutions.com*
Case 3:18-cv-00106-RJC-DSC   Document 84-2   Filed 06/24/20   Page 32 of 122
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 32 of 122

**Page 25**

1 manager or the assistant manager, a senior member who
2 is in the, you know, clerical staff.
3    Q.   Now, this record request comes in through a
4 vendor, who then apparently does a copying of the
5 records at your office location.  Is that something
6 you are familiar with?
7    A.   No.
8    Q.   Okay.  Do you have any idea the actual
9 mechanism by which your records were forwarded to AXA
10 for review?
11    A.   No.
12    Q.   Have you had an opportunity to evaluate those
13 records that were forwarded and that AXA relied upon
14 for reviewing your records?
15    A.   Yes.
16    Q.   Were those your records?
17    A.   Yes.
18    Q.   Were those complete records for the time
19 period that was requested?
20    MR. REILLY:  Objection.
21    THE WITNESS:  Yes.
22 BY MR. CASSOT:
23    Q.   There was nothing missing from that time
24 period?
25    MR. REILLY:  Objection.

**Page 26**

1    You can answer.
2    THE WITNESS:  I can't completely answer that
3 because the medical records of Mr. Wiener were
4 beyond my records.  And I can't answer that every
5 single bit of information that was collected for
6 him medically was present.  That would be
7 difficult for me to answer without going through
8 the entire....
9 BY MR. CASSOT:
10    Q.   Well, I'm going to provide you what has been
11 marked Exhibit 63 in this litigation.
12    MR. CASSOT:  We have been just using the same
13 records over and over again.  Do you guys need
14 copies?  Do you have them?
15    MR. REILLY:  I believe we have copies.
16    THE WITNESS:  I think I have this in here.
17 BY MR. CASSOT:
18    Q.   Well, I just want to make sure.  So that's
19 part what have we are going to do today, is we're
20 going to make sure that whatever was provided and
21 marked as Exhibit 63 is, in fact, a clear and accurate
22 copy of the records that you had in your possession
23 concerning Malcolm Wiener on those dates.
24    MR. REILLY:  This could be off the record.
25    THE WITNESS:  These are actually right here.

**Page 27**

1    (Off the record from 1:39 to 1:40 p.m., as
2    exhibits are organized.)
3 BY MR. CASSOT:
4    Q.   So, Doctor, I have just handed you what has a
5 hand-marked Exhibit 63.  And it looks like in your
6 records you have an actual copy of the Plaintiff's
7 Exhibit 63.
8    A.   Right.
9    Q.   Can you just real briefly -- I'm going to
10 assume and I think everybody can agree that what I
11 handed you as Exhibit 63 and the 63 that is in your
12 binder is the same?
13    A.   Yes.
14    Q.   Okay.  Now, that's one less copy to get rid
15 of.
16    So the records have on the front right corner
17 a date of 1-18-14.  Do you have any idea what that
18 date is related to?
19    A.   Presumably, when the records were copied.
20    Q.   Well, I'm going to ask you -- and if you had
21 an attorney representing you here today they would
22 tell you not to presume.
23    MR. REILLY:  Or speculate.  So you either
24    know our don't know.
25    THE WITNESS:  I don't know.

**Page 28**

1    MR. CASSOT:  If you know, you know.  And if
2    you don't, there is no harm in not knowing.
3    THE WITNESS:  I'm not sure.
4 BY MR. CASSOT:
5    Q.   So this front page, it says parameds.com.  Is
6 parameds.com in any way related to your practice?
7    A.   No.
8    Q.   Do you recognize parameds as a vendor that
9 obtains medical records from medical practices?
10    A.   No.
11    Q.   Okay.  All right.  The next page says, Record
12 PDC received for this applicant was illegible when
13 they were copied at the medical facility.
14    Do you have any knowledge of what that sheet
15 means other than the plain language of what it says?
16    A.   No.
17    Q.   We're going through to the following pages
18 and I'm just going to ask you to just thumb through
19 and confirm that every page that is contained in
20 Exhibit 63 is a page that would have been contained in
21 your medical records as of January 18, 2014.
22    A.   Yes.
23    MR. REILLY:  Objection.
24    Go ahead and look at it and see if you can
25    answer.

OBJECTION
p. 25:18-26:8
relevance

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-2   Filed 06/24/20   Page 15 of 23
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 33 of 122

OBJECTION
relevance

**Page 29**

1 THE WITNESS: Presumably, assuming they
2 copied everything in that time period, I would
3 say yes, but I can't assume that.
4 BY MR. CASSOT:
5 Q. Okay. Have you -- since this litigation
6 began in 2015, have you done any research of
7 Mr. Wiener's -- or any review of Mr. Wiener's original
8 records to determine whether any pages were missing
9 from Exhibit 63?
10 A. I reviewed the records, but did not look for
11 that particular issue. I was not thinking there was
12 something missing from this.
13 Q. Okay. Certainly, though, with respect to the
14 review, as you sit here today, you are not aware of
15 anything that jumps out at you and causes you to
16 believe, wow, they missed this page?
17 A. No.
18 Q. So as you sit here today, would you be 19
comfortable saying yes, this is a complete copy of 20
Mr. Wiener's records for the past five years as of 21
January 18, 2014?
22 MR. REILLY: Objection.
23 You can answer.
24 THE WITNESS: Yes.
25 BY MR. CASSOT:

**Page 30**

1 Q. All right. So some of my questions are going
2 to seem incredibly self-evident, especially to you as
3 a physician, but I do have to create a record for some
4 of this.
5 What is the purpose of you charting a
6 patient's visit? You take notes on a patient's visit,
7 correct?
8 A. Yes.
9 Q. What is the purpose of doing that?
10 MR. CASSOT: And if you need to take a call
11 at any point, we can will go off the record. Are
12 you good? Do you need to take it?
13 THE WITNESS: Yeah, it's an emergency, but I
14 can just text it. I apologize.
15 MR. CASSOT: We will go off the record. Do
16 whatever you need to do.
17 (Off the record from 1:45 to 1:46 p.m., as a
18 break is taken.)
19 BY MR. CASSOT:
20 Q. So in terms of where I left off was, You do
21 medical charting of a patient visit, correct?
22 A. Correct.
23 Q. What is the purpose of charting a patient's
24 visit?
25 A. It's to provide a record of information

**Page 31**

1 regarding the patient's medical history, his immediate
2 history, his previous history, current complaints in
3 the context of his past history, features of his
4 examination relevant to the current complaints, and
5 then both current testing and follow-up testing
6 necessary to manage the patient's medical condition.
7 Q. Okay, now --
8 A. And provide a record for future physicians to
9 be able to access so that they have an understanding
10 of the continuity of the patients.
11 Q. Okay. In addition to future patients, so in
12 other words, the continuity being if you were to
13 retire or the patient were to transfer care, a
14 physician looking at your record would be able to
15 piece together the history of the patient that the
16 doctor can refer to. Correct?
17 A. Correct.
18 Q. Okay, so -- and then also an additional group
19 of people, you have indicated that there could be
20 requests -- if there is an adverse outcome, there
21 could be requests of records which would be evaluated
22 to assess potential exposure that the practice or you
23 may have?
24 MR. REILLY: Objection.
25 THE WITNESS: Correct.

**Page 32**

1 BY MR. CASSOT:
2 Q. And then another group of people who might
3 rely on the records are insurance companies who are
4 looking for authorization for, for example, additional
5 procedures, medical procedures, those types of things,
6 correct?
7 A. Correct.
8 Q. In terms of -- is your practice audited by
9 any type of billing agency -- and by that I mean
10 insurance companies, Medicare, Medicaid, or anything
11 like that -- to ensure practice compliance with
12 billing guidelines?
13 A. They are subject to that.
14 Q. Okay. When you say subject to that, that
15 means that at any time any one of those agencies with
16 presumably fair notice can come in and do an audit of
17 your medical records?
18 A. Correct.
19 Q. So based on what we have just covered, would
20 you agree it's very important for you as a
21 practitioner to make sure that your medical records
22 are accurate?
23 A. Correct.
24 MR. CASSOT: Okay, let's go ahead and take
25 that break because I have got to see what my



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-2   Filed 06/24/20   Page 16 of 28
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 34 of 122

1 client wants to talk to me about. All right?

2     MR. REILLY: Okay.

3     (Off the record from 1:48 to 1:57 p.m., as a

4 break is taken.)

5 BY MR. CASSOT:

6     Q. We were talking about charting. With respect

7 to your personal practice of charting -- and I don't

8 want to be unfair because I know we were just having a

9 little bit of a discussion off the record and I don't

10 want it to appear like I have taken advantage of that.

11     So when you are doing charting, in 2000 --

12 let me direct your attention. If you look at the

13 bottom right-hand corner of the pages, I believe they

14 are Bates numbered on yours too.

15     A. Right, yeah.

16     Q. If you go to 2428, I believe that's where

17 your handwritten notes start.

18     A. (Seeking the correct page.) One more.

19     Q. Okay. 2428 is pretty much where the

20 handwritten notes start on Exhibit 63. Everything

21 prior to that are laboratory results. So let me

22 actually back up a little bit. The laboratory results

23 from Greenwich Hospital laboratory, are they forwarded

24 to you on a regular basis?

25     A. Yes.

1     Q. Okay. So, for example, if you look at 2427,

2 which is the prior page, I know that's not the entire

3 lab report, but just by virtue of that page, it has

4 administrative service date 3-2-11. What is that

5 date? Is that the date that the lab was done?

6     A. Yeah. Exactly.

7     Q. Okay. And then is it forwarded to you --

8 well, how long after the lab is done is it forwarded

9 to you?

10     A. It's usually within two to three days.

11     Q okay, and when you're looking at the labs, do

12 you review the labs with your patients on a regular

13 basis?

14     A. Frequently.

15     Q. And do you point out -- just speaking from

16 personal experience, my doctor will either say all

17 your labs are normal or this one is a maybe a little

18 not normal or whatever. Is that how you approach it

19 as well?

20     A. Yeah.

21     Q. So looking at, for example -- just by way of

22 example, the AXA 2427 and going down to albumin, 3.2

23 with an L next to it. What does that indicate to you

24 as a practitioner with respect to albumin?

25     A. As a physician, it is slightly below normal,

1 but then within the context of the others, I would say

2 we will follow up and repeat it and see.

3     Q. Okay. Would you have called out albumin as

4 something that you would be following with Mr. Wiener?

5     A. Yeah.

6     Q. Okay. Would you have had a discussion with

7 Mr. Wiener as to what albumin levels mean?

8     A. I may or may not have. I would ask him about

9 his diet and how is he feeling and make sure there is

10 no circumstances that are different.

11     Q. Okay. But that is something that you would

12 have continued to monitor?

13     A. Yeah.

14     Q. Okay. Now, then going to the next page,

15 2428, can you -- it appears to me that there is at

16 least two different people are handwriting on this

17 page, maybe more. Can you identify which portion of

18 this would be written by you.

19     A. The less legible. So here is what happens,

20 the past medical history generally is fixed based on

21 the prior history.

22     Q. Okay.

23     A. And so that remains there.

24     Q. So what does that mean, exactly?

25     A. And the medications are filled in by the

1 nurse. So what happens in this is prepared prior to

2 the visit by the nurse, who puts in what his medical

3 history was, and this, and then records the vital

4 signs.

5     So you can see the nurse will do that, put in

6 the vital signs. And then I will put in my,

7 essentially, discussion with the patient about what

8 his symptoms are, how he is feeling, his physical

9 examination, and then the current symptoms with the

10 impression and plan.

11     Q. Okay, so if -- and I'm not sure that it is,

12 but I think this might be the first handwritten notes

13 that we have. If this is the first handwritten note

14 that we have and it has under past medical history

15 memory loss, the nurse would have actually obtained

16 that from a prior note which we would not have?

17     A. Right.

18     Q. Do you know when the first time a reference

19 to memory loss showed up in one of Mr. Wiener's

20 records?

21     A. Again, this is a past medical complaint that

22 he always was concerned about that extended back even

23 into the early 2000s.

24     Q. Okay, now, HPI, above that, I'm going to ask

25 you to do --

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com
Case 3:18-cv-00106-RJC-DSC    Document 84-2    Filed 06/24/20    Page 10 of 28
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 35 of 122

Page 37

1    A.  An impossible job?
2    Q.  -- ask you to read your handwriting and tell
3  me what the HPI says there.
4    A.  Recurrent night sweats.  Let's see.  Hourly.
5  Hourly.  Changed multiple times.  Associated with
6  urinary frequency.  Episodes of urinary incontinence.
7  Associated with difficulty with sleep.  Vivid dreams.
8  Still with fatigue.  Notes -- this is my eyes now.
9  Notes he was seen for --
10       MR. REILLY:  These are simple magnifying
11  glasses if you want to try them.
12       THE WITNESS:  No.  No, it's not even that.
13       Oh, seen by -- and that's a physician, I
14  think, in New York.  Willy Nadler (ph).
15  W. Nadler for back pain.  Treated with local
16  steroids one week.  With marked nasal congestion.
17  Continued memory difficulty.  Daughter with --
18  there is something regarding his daughter.  Not
19  to his physical health.
20  BY MR. CASSOT:
21    Q.  But to hers?
22    A.  Yeah.
23    Q.  We don't need to discuss that.
24    A.  All right, so -- and then the impression down
25  below is urinary frequency.  Follow up with UA, urine

Page 38

1  culture.  Follow-up PSA.  Follow-up treatment based on
2  that.  Really, essentially, that's what it is
3  implying.  And --
4    Q.  What's number 2?
5    A.  Yeah, that's what I'm getting.  AFib.
6  History.  This one says history.  And I'm just
7  describing the medicines.  He's on blood pressure
8  medicine Norvasc, amlodipine.  And then basically the
9  medications.
10       And then memory loss associated with fatigue.
11  Adult insomnia.  Question: multifactorial.  And then
12  again that's medication he is on.  Therefore
13  intention.  Follow up with -- and that's with the --
14  there is a doctor in New York for neuropsych testing.
15    Q.  Do you know if he ever followed up for the
16  neuropsych eval?
17    A.  I think he was being seen there by -- and
18  Carolyn might know that.  Dr.?
19    Q.  Unfortunately, Ms. Wiener's deposition has
20  been taken.  And I might have missed that opportunity
21  to ask that question so I'm going to just leave it at
22  that.
23    A.  The answer is yes, by the way.
24    Q.  And did you get any of the reports from the
25  neuropsychologist concerning --

OBJECTION
foundation

Page 39

1    A.  Yes.
2    Q.  Are they included in your records?
3    A.  No.
4    Q.  And why is that?
5    A.  They are in the records, but they weren't
6  copied.  Part of the reason why I answered that way is
7  they are not my records.  They are in the records of
8  correspondence that were sent to me, but they are in
9  our records -- they are in my records.
10    Q.  Okay, are there any other records of any
11  other physicians that were in your records that were
12  not copied as far as you know?
13       MR. REILLY:  Objection.
14       THE WITNESS:  Yes.  Yes, sure.
15  BY MR. CASSOT:
16    Q.  Who else's?
17    A.  David Blumenthal.
18    Q.  Okay.
19    A.  Which I have brought his notes.
20    Q.  Yeah, I saw that.
21    A.  I think there are some other physicians in
22  New York as well.
23    Q.  Okay.
24    A.  You know, I think you just mentioned you are
25  going to be taking his deposition.

Page 40

1    Q.  Okay.  All right, so I don't think it's
2  necessary to read every single page of this, but is
3  there -- at any point, did Mr. Wiener's concerns of
4  memory loss ever abate with respect to the treatment
5  notes that are in front of us?
6       MR. REILLY:  Objection.  What do you mean
7  abate?
8  BY MR. CASSOT:
9    Q.  Is there any point in which you were treating
10  Mr. Wiener during the time frame that these notes
11  cover where you did not acknowledge memory loss as
12  part of your impression and plan?
13       MR. REILLY:  Objection.
14  BY MR. CASSOT:
15    Q.  We can go through it day by day.  So let's do
16  that.
17       The first note I showed you was 24288.  The
18  date was 4-29-11.  Would you agree that memory loss
19  was part of your impression and plan?
20    A.  Yes.
21    Q.  And, in fact, you had underlined memory loss,
22  correct?
23    A.  Um-uh.
24    Q.  What is the reason for underlining that?
25    A.  Well, that's just another way of highlighting


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-2   Filed 06/24/20   Page 18 of 18
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 36 of 122

Page 49

1      THE COURT REPORTER:  MPH?
2      THE WITNESS:  MTHFR.  MTHFR gene with
3   positive homozygous, H-O-M-O-Z-Y-G-O-U-S.  I'm
4   not sure I can make out the next words.
5   BY MR. CASSOT:
6      Q.   Okay.  I want to go down under review of
7   symptoms.  You had circled loss of fatigue.  Was there
8   a reason you had circled loss of fatigue -- I'm sorry,
9   not loss of fatigue.  You had circled fatigue.  Is
10  there a reason that you circled fatigue?
11     A.   Well, it's a common complaint.  You know, it
12  had been one of the complaints that he had, mild
13  fatigue.
14     Q.   Okay.  Chest pain, that's circled obviously
15  because of the discussion in the HPI?
16     Q.   Okay.
17     Q.   Mental status change under neurological, you
18  had that circled.  Why is that circled?
19     A.   Related to the memory.
20     Q.   Okay.  And what's next to that handwritten?
21  It looks like --
22     A.   Occasional instability.
23     Q.   -- instability.  That goes to the gait?
24     A.   Yes.  Yeah, that's right.
25     Q.   And then psychiatric, you have confusion and

Page 50

1   memory loss circled.
2      A.   Right.  Well, he had moments where the
3   confusion would concern him.
4      Q.   Okay.  In terms of when you do the review of
5   symptoms, is that your objective evaluation of the
6   patient or is that just patient complaint?
7      A.   All patient complaints.
8      Q.   So in other words --
9      A.   Those are his symptoms.
10     Q.   Those are his symptoms as reported to you?
11     A.   Yeah, they are not documented medical
12  conditions.  They're symptoms.
13     Q.   Okay.  So how would a patient report to you
14  gout?
15     A.   That would -- down there where it says gout?
16     Q.   Um-uh.
17     A.   Podek (ph) would be a classic symptom of a
18  large swelling with pain in the great toe.
19     Q.   So that would actually -- rather than saying
20  gout, if we were reporting based on the patient's
21  symptom it would be pain in great toe, correct?
22     A.   Yeah, and then you put gout as a potential,
23  right.
24     Q.   Okay.  Would you ever circle something in the
25  review of symptoms that you did not think was present?

Page 51

1      MR. REILLY:  Objection.
2      THE WITNESS:  No.
3   BY MR. CASSOT:
4      Q.   It looks like on -- well, it continues on.
5   The two 1612 goes on to page 2452.  And if you look
6   under impression and plan, it has chest pain
7   underlined and then your handwriting under 1.  And
8   then two says memory loss, slash, and then what is
9   after that?
10     A.   That's the history of possible CVA.
11     Q.   What does history CVA mean in layman's terms?
12     A.   Well, question stroke.  But I think that that
13  has been noted that there is subsequently no evidence
14  by scanning for that.
15     Q.   Is that noted in your record?
16     A.   Well, I think what we have noted is that
17  there is no further indication that he had that.
18     Q.   Can you show me where in the record it says
19  that, where in the record that is in front of us?
20     A.   Well, the record does not show that in any of
21  the medical history.  Subsequent history is absent
22  from the history.
23     Q.   So explain what you mean by what you just
24  said.
25     A.   There is no documentation of a stroke.

Page 52

1      Q.   In the subsequent history.
2      A.   Yeah.  Yeah, so the subsequent notes, really
3   it's absent from there.
4      Q.   Correct.
5      A.   Because you did not identify it by scan or
6   CT.
7      Q.   But on number 2, it says memory loss, slash.
8   That's history of stroke, correct?
9      A.   Yeah.  And again we are not always perfect,
10  so that is the issue, right.
11     Q.   Doctor, I'm not here to criticize anybody.
12  I'm just here to understand what is in the medical
13  record.
14          So in terms of what is in the medical record,
15  on February 16, 2012, what you wrote in the record was
16  memory loss, history of stroke.  Correct?
17     A.   Right.
18     Q.   Okay.  And so when you are talking about a
19  history of stroke, that's not discussing what goes on
20  in the future.  That's discussing what happened in the
21  past?
22     A.   Right.
23     Q.   Okay, so based on an objective review of this
24  entry on this medical record is it reasonable to
25  understand if I read this medical record, that you

Case 3:18-cv-00106-RJC-DSC   Document 84-2   Filed 06/24/2
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 37 of 122

Page 53

1 were his treating doctor since 1998 and you wrote down
2 memory loss, history of stroke, that Mr. Wiener did
3 have a history of a stroke?
4     MR. REILLY: Objection.
5     THE WITNESS: There is a difference between a
6 legal and a medical record. Let me explain.
7     MR. CASSOT: Actually, let me stop you right
8 there.
9     And I would like you to read back the
10 question.
11     MR. REILLY: He was answering the question.
12     MR. CASSOT: Not necessarily.
13     THE WITNESS: I'm answering the question.
14     MR. REILLY: Well, he should be allowed to
15 answer the question. Then if you want to repeat
16 it or rephrase it, we will.
17     MR. CASSOT: We will see.
18     MR. REILLY: I would like the witness to
19 finish the answer.
20     Go ahead.
21     THE WITNESS: We are actually -- we have had
22 recent coding discussions regarding what we put
23 in the chart. The chart indicates what we
24 suspect may be going on. And we put that down
25 even if it's not definitive.

Page 54

1     So if we are concerned about that, we would
2 place that as possible. I didn't put in the word
3 possible. I should have, because that was an
4 error.
5     But the following discussion under that
6 indicates repeat neuro evaluation, needs follow-
7 up MRI, in other words, the testing to identify
8 whether or not that is true.
9 BY MR. CASSOT:
10    Q. Um-uh. Is any of that -- any of the follow-
11 up testing or anything in the records that were
12 produced to AXA? Any records indicating that stroke
13 had been ruled out? Was that produced?
14    A. Well, I have a CT scan report that I can get
15 that was negative.
16    Q. Okay, were any of the records that were
17 produced to AXA -- I want you to assume that was
18 produced to AXA as Exhibit 63.
19    A. No.
20    Q. Is there anything in Exhibit 63 that rules
21 out the history of stroke?
22     MR. REILLY: Objection.
23     THE WITNESS: It was not -- as far as I can
24    see, you did not receive that information.
25 BY MR. CASSOT:

Page 55

1    Q. Okay, so I want to go back to the original
2 question that I asked that Mr. Wiener's counsel had
3 asked that you be able to finish your answer. Now I'm
4 going to ask you to answer my question, which was,
5 Would an objective reading of this medical record
6 advise the reader that in your belief Mr. Wiener had a
7 history of stroke?
8     MR. REILLY: Objection. Objective reading of
9 Exhibit 63?
10     THE WITNESS: The single note, yeah.
11     MR. REILLY: Of Exhibit 63.
12     THE WITNESS: I answered yes.
13 BY MR. CASSOT:
14    Q. Oh, you answered yes?
15    A. Yeah. Reading that single note, yes.
16    Q. Okay, reading that single note. All right.
17     And there is nothing in this record that was
18 provided that indicates that the history of stroke
19 was, in fact, ruled out?
20    A. Right.
21    Q. What is the next line? I couldn't even make
22 that out. Number 3, I think.
23    A. The next line?
24    Q. Yes.
25    A. Oh, you mean --

Page 56

1    Q. 2452.
2    A. -- the next diagnosis.
3    Q. Yes, the next, under impression.
4    A. Homozygous MTHFR gene mutation.
5    Q. Okay, what is that?
6    A. It's a metabolic gene involved in the
7 conversion of an enzyme -- of a compound called
8 homocysteine into methionine, which is an amino acid
9 that requires the addition of a single carbon methyl
10 group that takes -- that's added to homocysteine to
11 make methionine.
12    Q. Okay.
13    A. It requires folic acid as a cofactor that
14 binds and is able to supply the methyl, single carbon
15 methyl group. People who have a defect in that
16 conversion have been hypothesized to have higher
17 cardiovascular risks because it leads to excessively
18 high levels of that homocysteine because of the lack
19 of conversion to methionine.
20    Q. So you give him a vitamin B12 shot?
21    A. You give folic acid, actually. It turns out
22 that it's a hypothesis and not proven.
23    Q. But because it's a hypothesis and you don't
24 want to risk it, you go ahead and treat for it anyway?
25    A. Sometimes they overtreat it so that it

OBJECTION/MOVE
TO STRIKE
p. 53:11-20
counsel colloquy

OBJECTION/MOVE
TO STRIKE
p. 53:21-54:8
non-responsive

MOVE TO STRIKE
counsel's objection

MOVE TO
STRIKE
counsel's
objection

ESquireSolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-2   Filed 06/24/20   Page 22 of 28
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 38 of 122

Page 65

1  might be esophageal reflux.
2      Q.  Okay.  Is there any -- was there any follow-
3  up that you can recall concerning a GI assessment for
4  esophageal spasm?
5      A.  I think if he recurred, we were planning on
6  doing that when he had it.
7      Q.  Okay.  Then number 2, his memory loss remains
8  intermittent, bothersome.  And you indicated strongly
9  recommend he follow-up with a sleep study as
10  discussed.
11      A.  Yes.
12      Q.  And was there a sleep study done?
13      A.  He had that done in New York, yeah.
14      Q.  And did the sleep study resolve in any way
15  his memory loss issues?
16      A.  I think he actually -- I think they tried to
17  use a BiPAP and he had trouble.  But I could be wrong
18  -- no, no.  I'm sorry.
19          And, again, to simply answer, you know, to
20  add something that is in the chart, not this
21  information, but is in the bigger chart information
22  from New York and his mental status testing, despite
23  his memory loss, he never had evidence clinically of
24  difficulty during conversations or any of the -- that
25  indicated any memory issue.

Page 66

1          And he was tested and always had a completely
2  normal mental status exam with excellent recent acute
3  and remote memory.  So there was never any findings of
4  this.  It was his own sense that he kept reporting he
5  was bothered by.
6      Q.  Okay.  And those were reports that you
7  continued to include within your medical records?

OBJECTION/MOVE
TO STRIKE
non-responsive

8      A.  Because he always said, you know, I'm just
9  bothered by this.  Remember, in his 70s, he was
10  extremely highly functional -- continued to travel,
11  participated in meetings.  He was doing things that
12  most 50-year-olds might have difficulty with.  So he
13  held himself to an extremely high standard.
14      Q.  I hope what you are saying is that people who
15  are 70 shouldn't be president, because that would be
16  really helpful right now, but I don't think that's
17  what you mean.
18      A.  Well, I think nobody here would argue that
19  that's not a memory issue.  But that's an example of
20  not admitting.  There is somebody who should admit, I
21  can't remember.
22      Q.  Yeah.
23      A.  So that's the difference between humility,
24  self-understanding, and the opposite.
25      Q.  This divergence, we need to bring this back

Page 67

1  into the issues.
2          MR. REILLY:  I'm not sure if I should be
3      objecting or not.
4          THE WITNESS:  And, fortunately, we are not
5      deposing him.
6          MR. CASSOT:  How much fun could that be.
7  BY MR. CASSOT:
8      Q.  All right, so now moving on to the real
9  issues that bring us here today.  Moving on to the
10  next encounter, September 26, 2012.
11          Now, you continue to reference the history of
12  monoclonal gammopathy, but that's -- as I understand
13  your prior testimony, that is because he would have
14  had a finding of monoclonal gammopathy, but you
15  believe that resolved.
16      A.  Yes.  But, again, past medical history --
17      Q.  Is recorded?
18      A.  -- is past medical history.
19      Q.  Correct.
20      A.  Yes.
21      Q.  So I'm just trying to understand why it
22  continues to show up.  It shows up because it was in
23  the past.
24      A.  That's why he still is listed as having had a
25  tonsillectomy.  It may be there.  I'm not sure.

Page 68

1      Q.  He may not want to make that representation
2  until --
3      A.  But if you put in surgical history, even a
4  tonsillectomy at the age of five will show up in your
5  80s.
6      Q.  Okay.  All right.  Let's see if there is
7  anything else I need to ask you about on that.
8          Then I don't really care about his sebaceous
9  cyst.  (After perusal of records.)  All right, so I
10  think we are pretty much done with the medical
11  records.  Let me ask you, then, a couple of other
12  questions.
13          Have you done any epidemiology research?
14      A.  Not formally, but I lecture in the school of
15  epidemiology or the section of public health at Yale.
16      Q.  Okay.
17      A.  And I do participate in research articles
18  where we review epidemiology.  So, you know, it's part
19  of my interest, but....
20      Q.  Sure.
21      A.  The answer is:  I don't sit down and formally
22  do the epidemiologic research per se.
23      Q.  Okay.  Have you ever done any research with
24  respect to patient mortality?  All-cause mortality,
25  for example?

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-2   Filed 06/24/20   Page 29 of 79
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 39 of 122

**Page 69**

1    A.  Yes, certainly.

2    Q.  In what context?

3    A.  Well, usually within the context of what's

4  called global burden of disease, origins of modern

5  mortality in terms of noncommunicable disease that has

6  accelerated the last 70 years and the causation for

7  that.

8    Q.  Okay.  Have you done any research concerning

9  the relationship between serum albumin's and all-cause

10  mortality risk?

11    A.  No, but I'm familiar with it.

12    Q.  How are you familiar with it?

13    A.  I have reviewed some of the research on that.

14    Q.  What research did you review?

15    A.  There is -- there are articles indicating a

16  potential association between levels of albumin and

17  outcome and all-cause mortality.  There are also

18  articles arguing that the exact definitive nature of

19  this remains unclear.

20    Q.  Okay.  And, again, I think we kind of covered

21  this earlier.  You are not in a position as a medical

22  doctor to have an opinion with respect to whether an

23  insurance company's reliance on various labs is

24  appropriate in the underwriting process?

25    A.  Correct.

**Page 70**

1      MR. REILLY:  Objection.

2  BY MR. CASSOT:

3    Q.  Put differently, you are not an expert in

4  insurance underwriting?

5    A.  No, but I do have a perspective on using

6  values clinically, which is the most relevant

7  understanding in individuals how that impacts on

8  long-term outcome.

9    Q.  And that's an understanding of the clinical

10  use of these.

11    A.  Correct.  Correct.

12    Q.  And you would acknowledge that the clinical

13  environment is different from the underwriting

14  environment?

15    A.  Right.

16      MR. CASSOT:  All right, let's take a break,

17  because I may not have any more questions.  I

18  just want to confer with my client and then I may

19  be done.  And then Brian can go and then he will

20  be your witness.

21      MR. REILLY:  All right.

22      (Off the record from 3:01 to 3:13 p.m., as a

23  break is taken.)

24      MR. CASSOT:  The record should reflect that I

25  have completed my questioning of Dr. Boyd.

**Page 71**

1      MR. PALMERI:  And I have no questions.

2      MR. REILLY:  Okay, I have questions.

3          CROSS EXAMINATION

4  BY MR. REILLY:

5    Q.  Doctor, if there was actually a true and

6  actual history of stroke from Malcolm Wiener, would it

7  be expected that any reasonable practitioner would

8  have noted either CVA or stroke in the history in the

9  medical records?

10    A.  Yes.

11    Q.  And is that noted in any of Mr. Wiener's

12  medical documents in your file prior to that one

13  single entry?

14      MR. CASSOT:  I object to the form.

15      THE WITNESS:  No.

16  BY MR. REILLY:

17    Q.  Is it noted anywhere in Mr. Wiener's medical

18  records that is Exhibit 63 after that one single entry

19  that says CVA?

20    A.  No.

21    Q.  Does any other document in Exhibit 63

22  indicate that Malcolm Wiener had a stroke or a CVA

23  other than that one writing?

24    A.  No.  No.

25    Q.  Is there any evidence within Exhibit 63 that

**Page 72**

1  Mr. Wiener had a stroke between his last visit in

2  January 2012 and that visit where CVA is written?

3    A.  No.

4    Q.  What kind of record or test would constitute

5  medical proof of a stroke or CVA?

6    A.  A neurologic exam showing focal

7  abnormalities, which he did not have (and I noted

8  multiple times that he had no focal findings), a scan.

9  And he had a negative CT scan, which I also noted.

10      And for the purposes of understanding how the

11  record is generated, on occasion we think, could it

12  have been?  And instead of saying -- they always tell

13  us never write rule out.  That is a wrong diagnosis.

14  You put that in if you think that may be part of it

15  and then you go on to follow up.  And that is really

16  what that is meant to indicate.

17    Q.  When you say that was what it was meant to

18  indicate, what are you referring to?

19    A.  There is a possibility that we need to --

20  instead of saying rule out, because we don't put those

21  in records anymore, we say question.  And I should

22  have put a question mark there.  Possible CVA.  But I

23  did not.

24    Q.  All right, so I just want this to be very

25  clear.  I'm looking at the page of Exhibit 63 marked

OBJECTION
foundation,
undisclosed
expert opinion

**ESQUIRE**
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 3:18-cv-00106-RJC-DSC   Document 84-2   Filed 06/24/20   Page 26 of 28
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 40 of 122



## Planet Depos®
We Make It Happen™

# Transcript of Hallie Hawkins, Corporate Designee

**Date:** August 24, 2017
**Case:** Wiener -v- AXA Equitable Life Insurance Company, et al.

---

### LEGEND
### DESIGNATIONS BY COUNSEL

**Plaintiff: Text in yellow**

**Defendant: Text in blue**

**Both Parties: Text in green**

---

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

1                    UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF NEW YORK
2

3

4   MALCOLM H. WIENER,                  )
            Plaintiff,                  )    Civil Action No.
5                                       )    1:16-CV-04019-ER
    VS                                  )
6                                       )
    AXA EQUITABLE LIFE INSURANCE        )
7   COMPANY, DAVID HUNGERFORD, AXA      )
    ADVISORS, LLC, and AXA NETWORK,)
8   LLC,                                )
            Defendants.                 )
9

10

11                    DEPOSITION OF:   AXA EQUITABLE

12                                     BY AND THROUGH ITS

13                                     DESIGNATED REPRESENTATIVE
                                       Hallie Hawkins
14              DATE:                  August 24, 2017
                HELD AT:               Morrison Mahoney LLP
15                                     One Constitution Plaza
                                       Hartford, Connecticut
16

17

18

19

20       Reporter:  Robin Balletto, RMR, LSR #230

21

22

23

24

25

1  okay?  I know you're in a different role right now, so

2  I want you to think about that perspective.

3       A   I understand.

4       Q   Thanks.  So can you describe the

5  reinstatement process for me?

OBJECTION
p. 18:4-21:21
relevance

6       A   From what aspect?

7       Q   From your role as chief underwriter, like

8  when you would get involved, the beginning, and how

9  you moved through reinstatements?

10      A   A case would be referred to me, I would

11  review the application, any possible MIB codes.

12      Q   Go ahead.

13      A   And then I would make a decision on whether I

14  needed to order an attending physician's statement or

15  not.

16      Q   So let's break that down a little bit.  How

17  does a case get referred to you?

18      A   It depends on when the policy was issued.

19      Q   Okay.  So what are the different categories

20  of policies that could be issued timing wise?

21      A   It depends.  The timing is more in

22  correlation with the system that is stored in -- some

23  of our policies have been in force for a long time, so

24  they are on a legacy system.

25      Q   And if they're not on a legacy system, where

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 19 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 43 of 122

1    are they stored?

2         A    They're stored on our current system, which

3    is called N like Nancy, B like boy, A like Ann.

4         Q    You said that it depends on if they're on the

5    legacy system or this newer system how a case is

6    referred to you?

7         A    Yes.

8         Q    So can you describe just the differences?

9         A    The legacy system is in something called AWD.

10        Q    What does that stand for?

11        A    I don't know.

12        Q    So if a case is referred to you and it's a

13   legacy, an older policy, is this AWD system something

14   that notifies you?

15        A    The paid change person generally, and I don't

16   remember on this case, but they generally would send

17   you an e-mail saying you have a case in AWD, and then

18   we would go in there and look at it.

19        Q    What's a paid change person, or who?

20        A    That would be -- in this case it was Sandra

21   Huffstedler.

22        Q    So that's a job role?

23        A    I don't know her exact title, but she works

24   in that department.

25        Q    Was this case -- was this instance in the

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 20 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 44 of 122

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | So they're not underwriters, correct? |
| 3 | A | No, they're not. |
| 4 | Q | But do you work with them? |
| 5 | A | Yes. |
| 6 | Q | In connection with reinstatements? |
| 7 | A | And pay changes. |

OBJECTION
relevance
p. 22:8-23:1

8 Q Okay. What sort of tools do you use to

9 evaluate reinstatement applications, and by tools I

10 mean like do you have a software program that you use,

11 or a computer system? Like how do you --

12 A I read the records.

13 Q Okay. What about like manuals or guidelines?

14 A After I review the records, I check our

15 underwriting manual. There's also a life underwriting

16 release.

17 Q Are there only -- is there only one life

18 underwriting release in force at a time? Like would

19 you only look at one particular, the latest one, or do

20 you have a series of underwriting releases that you

21 look at?

22 A I don't quite understand the question.

23 Q So a life underwriting release, what is that?

24 A Okay. So it is guidance on how to handle

25 situations that are not included in the underwriting

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 23 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 45 of 122

1    manual.

2        Q    And does that get updated?

3        A    Yes, it does.

4        Q    Where do you access the underwriting manual

5    and the life underwriting release?

6        A    The underwriting manual is on a -- I'll do

7    the life underwriting release first.  The life

8    underwriting release is kept in a database called

9    SharePoint.

10        Q    And the manual?

11        A    The manual is a manual called, at the time on

12    Mr. Wiener's --

13        Q    Reinstatement.

14        A    -- reinstatement, was a manual called Gen Re,

15    and that's a web based.

16        Q    So you would go to a specific website to

17    access it?

18        A    Well, it's saved for me, but yes, correct.

19        Q    Can you explain the impact of reinsurance in

20    a reinstatement application?

21             MR. CASSOT:  Object to the form.

22    BY MS. GUERTIN:

23        Q    Do you understand what I'm asking?

24        A    I can't -- it would depend on the case.

25        Q    Okay.  How about, what does FAC reinsurance

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-3  Filed 06/24/20  Page 24 of 275
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 46 of 122

1     Q   Could you estimate how many you were working

2  on at a given time?

3     A   I could for this one case.

OBJECTION
relevance
p. 26:1-29:20

4     Q   Okay.

5     A   I was working on one at that time.

6     Q   Okay.  So is that typical?

7     A   Yes.

8     Q   So generally speaking, you would be working

9  on one reinstatement at a time?

10    A   Yes.

11    Q   You didn't have like a case load of multiple

12 reinstatements you were working on at once?

13    A   I did not have a case load of multiple

14 reinstatements I was working on at once.

15    Q   How long does the reinstatement process

16 usually take?

17    A   There is no way to quantify that.  It just

18 depends.  A lot of it depends on how long it takes to

19 get the records from the attending physician.

20    Q   So that's the bottleneck, usually, the

21 records?

22    A   That's correct.

23    Q   When you're evaluating a reinstatement, who

24 do you typically speak with about the reinstatement?

25    A   I don't understand your question.

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 27 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 47 of 122

1              MR. CASSOT:  You beat me to it.  Object

2      to the form.

3  BY MS. GUERTIN:

4      Q   So you reach out to the physician, correct,

5  to request records?

6              MR. CASSOT:  Object to the form.  Go

7      ahead.

8              THE WITNESS:  I do not.

9  BY MS. GUERTIN:

10     Q   You do not?

11     A   No.

12     Q   Who does?

13     A   The pay change person assigned to the case,

14  and they may use a vendor.

15     Q   Can you give me an example of a vendor?

16     A   I don't know the one that they use, but

17  there's four or five vendors.

18     Q   Is Parameds a vendor?

19     A   Yes, that's correct.

20     Q   Do you talk to -- do you reach out to the

21  policyholder at all?

22     A   No.

23     Q   Do you reach out to their financial advisor

24  that works for AXA?

25     A   I could.

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-3  Filed 06/24/20  Page 28 of 275
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 48 of 122

1    would also depend on the medical history of the

2    proposed insured.

3         Q    So how do you know -- what sort of training

4    do you have to know what you're looking at in the

5    medical records?

6         A    I have been through medical training for most

7    of my career.  We are trained on everything that a

8    medical person would need.  We are trained on cancers,

9    cardiac disease, hematology, neurology.  Medical

10   directors actually do the training for us.  In

11   addition I've taken courses.

12        Q    And do you have to take continuing education

13   courses?

14        A    We have courses every year.  It's not

15   required, but we do do it.  AXA requires it.

16        Q    Do you have any certifications?

17        A    Yes, I do.

18        Q    What are those?

19        A    I have an FLMI, which is a Fellow of the Life

20   Management Institute, and I also have an FALU, which

21   is Fellow of the Academy of Life Underwriting.

22        Q    How did you get those certifications?

23        A    I studied.

24        Q    So is there a program that you had to take?

25        A    It is self-study.  There's manuals that we

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 31 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 49 of 122

1    read, and then we have to -- once a year they have a

2    test.

3         Q    So you sat for two tests?

4         A    No.

5         Q    Just one test?

6         A    No.  For the FLMI it's ten tests, and for the

7    FALU it's an additional four, so you have to have --

8         Q    Fourteen tests.

9         A    Pretty much, yes.

10        Q    And when did you get those certifications?

11        A    I received my FALU in 2008, and my FLMI was

12   before that, I would say, I think, 2007.  I could be

13   off a little bit by a year on the FLMI.

14        Q    That's fine.  Don't worry about that.  And do

15   you need to take any courses to maintain those

16   certifications?

17        A    No.

18        Q    After you've done your review of a

19   reinstatement application, say you deny the

20   reinstatement application, can that decision be

21   appealed by the insured?

22        A    No.  We don't have a formal appeal process.

23        Q    So do clients ask for reconsideration

24   anyways, even though there's no formal appeal process?

25        A    I suppose they could informally.

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 32 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 50 of 122

1    application.

2          Q    If you just turn the page.  At the top of the

3    page there's a reference to "paid up extended term."

4    Do you know what that term means?

5          A    Only at a high level.

6          Q    Can you tell me?

7          A    A person can have a whole life policy, and

8    it's a non-forfeiture benefit on the policy.

9          Q    What does that mean?

10         A    That would mean if you had a policy, you

11   could convert it to term and you wouldn't have to pay

12   the premium anymore for a certain number of years.

13         Q    So meaning they've already paid for the whole

14   policy essentially?

15         A    Not exactly correct.

16         Q    Okay.  Can you clarify?

17         A    If there's cash value in the policy, and they

18   don't want to pay a premium anymore, there's a

19   non-forfeiture benefit in some policies, and I don't

20   know by policy, but where you can actually not want to

21   pay the premium anymore, and they will determine a

22   death benefit, and they will turn the policy into a

23   term policy.

24         Q    You can put that aside.  I'm going to show

25   you what has previously been marked as Hungerford

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 41 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 51 of 122

1   Exhibit 31.  Take a look at that.  Do you recognize

2   this document?

OBJECTION
p. 40:24-43:12
relevance

3        A    Yes, I do.

4        Q    What is it?

5        A    It's a life underwriting release.

6        Q    And is this a document that you refer to in

7   your line of work?

8        A    There's a more current version, I believe.

9        Q    Okay.  So this is an older version?

10       A    That's correct.

11       Q    Was this version in force at the time that

12   Mr. Wiener's 2013 termination and reinstatement were

13   being processed?

14       A    I believe it was a 2011 document.

15            MS. GUERTIN:  Let's go to that one.

16            (Plaintiff's Exhibit 52, Life

17   underwriting release Bates stamped AXA001498 through

18   1502:  Marked for Identification.)

19   BY MS. GUERTIN:

20       Q    All right.  Let me show you what's been

21   marked as Plaintiffs' Exhibit 52.  Do you recognize

22   this document?

23       A    Yes, I do.

24       Q    Is this the more current life underwriting

25   release you just referenced?

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 42 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 52 of 122

```
1    sentence says, Non-medical age and amount underwriting

2    requirements.  Can you explain what those terms mean?

3         A    Yes.  Age and amount underwriting

4    requirements are what we obtain on new business.

5         Q    Okay.

6         A    And they give you some examples here, which

7    would be an inspection report, a motor vehicle record,

8    and financial data.

9         Q    What kind of an inspection report?

10        A    An inspection report is where we call the

11   client, we ask questions, and then we contact a third

12   party who knows about the client's financial history,

13   and we could also do a search, a record search, a

14   non-medical record search.

15        Q    What kind of a third party would you reach

16   out to about the financial history?

17        A    I would not do that.  Our vendor does that.

18        Q    Your vendor?

19        A    Yes.  We have a vendor that does those for

20   us.

21        Q    Okay.  Who is that vendor?

22        A    We have a couple of them.

23        Q    Okay.  Do you know why a financial history is

24   important?

25                   MR. CASSOT:  One thing is clear, when
```

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 47 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 53 of 122

1    you read the sentence you left out the part that

2    says, "Generally should not be requested unless

3    the risk presented." So these are things that are

4    done in new business, not in reinstatements.

5              MS. GUERTIN: Okay.

6              MR. CASSOT: So you're welcome to

7    continue this line of questioning, but just so

8    we're clear, these things are not done in

9    reinstatements.

10             THE WITNESS: That's correct.

11   Generally, yes.

12   BY MS. GUERTIN:

13       Q    Okay, good. So then what do you request for

14   reinstatements if you're not looking for non-medical

15   age and amount underwriting requirements?         OBJECTION
                                                        relevance

16       A    Generally I would ask for an attending

17   physician's statement.

18       Q    Is then the next sentence where it says,

19   "Medical requirements, however, should be consistent

20   with the reinstatement guidelines outlined in this

21   document and those normally requested for new

22   business, e.g., blood/urine, APS's, et cetera, if

23   warranted." So what does it mean if warranted?

24       A    I can give you an example.

25       Q    Sure.

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 48 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 54 of 122

1    certain amount of time, and that differs by policy.

2    The premium would be waived while the person was

3    disabled.

4        Q    And then LTCS?

5        A    I believe that stands for the long-term care

6    supplement.

7        Q    Do you know what that entails?

8        A    Yes, I do.

9        Q    Can you explain?

10       A    It's a rider on a policy, and the rider

11   allows for the death benefit to be accelerated if the

12   individual needs a long-term care.

13       Q    Underneath that section there's a section for

14   a number of days 121 to 180; do you see that?

15       A    Yes, I do.

16       Q    And here it splits, under age 70, and age 70

17   and up.  Do you know why there is a split there?

18       A    I did not write the guideline.

19       Q    Okay.  My question is, do you know why there

20   is a difference between people under age 70 and people

21   over age 70?

22       A    May I read it for a moment?

23       Q    Yes.

24       A    I don't know for 100 percent sure.

25       Q    Okay.  What do you know about it?

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 53 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 55 of 122

```
 1        A    Generally as people get older their mortality
 2   risk increases.
 3        Q    So it has something to do with their
 4   mortality risk?
 5        A    That's correct.
 6        Q    Is there a difference in the analysis, in the
 7   underwriting analysis that you do, for someone that's
 8   70 and up and is applying new business application
 9   versus a reinstatement application?
10                MR. CASSOT:  Object to the form.
11                THE WITNESS:  He objected, didn't he?
12                MR. CASSOT:  But you still can answer.
13   BY MS. GUERTIN:
14        Q    If you understand.
15        A    I'm sorry, because he did I lost my train of
16   thought.  Can you ask me again?
17                MR. CASSOT:   I warned you about that.
18   BY MS. GUERTIN:
19        Q    So if someone over 70 applies for a life
20   insurance policy and you do an underwriting review, is
21   there a set of guidelines that you look at to
22   determine whether to approve that application?
23        A    Yes.
24        Q    And is that the same set of guidelines that
25   you would look at to determine if someone over the age
```

OBJECTION
relevance

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-3  Filed 06/24/20  Page 54 of 275
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 56 of 122

1    BY MS. GUERTIN:

2        Q    So if they had a rating E, D, C, V, or any of

3    these others, they could be issued that sort of

4    policy?

5        A    New business.

6        Q    Now, walk me through how you would use this

7    with respect to a reinstatement?

8        A    The same basic concept, but I would have to

9    compare the current assessment with what the policy

10   was issued at.

11       Q    Okay.  And if you refer back to this exhibit

12   we were looking at before, 52, and the table that's on

13   page 1500.

14       A    Yes.

15       Q    So is this what you would look at to

16   determine whether reinstatement could be approved?

17       A    Yes.

18            MR. CASSOT:  I should state that classes

19       and tables are essentially the same thing.  The

20       terms are used interchangeably.

21   BY MS. GUERTIN:

22       Q    Classes and tables.  I'm sorry, I don't

23   understand what that means.

24       A    I just said table B and C, it is also called

25   class B and C.  The terms are used interchangeably.

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-3  Filed 06/24/20  Page 63 of 275
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 57 of 122

1      Q    Okay.  So on page 1500 of Exhibit 52 there's

2    a section there that says current assessment.  So when

3    it says same rating as original, does that mean, for

4    example, that at the inception of the policy they

5    might have been a B, and now they're still a B?

6      A    Uh-huh.

7      Q    So you would approve the reinstatement

8    according to this?

9      A    That's correct.

10     Q    If the policy was in force for five years or

11   less?

12     A    Yes.

13     Q    Do you recall when you looked at Malcolm

14   Wiener's reinstatements if he had the same rating at

15   the time of the reinstatement as he did when the

16   policy incepted?

17     A    He did not.                        OBJECTION
                                               relevance
18     Q    Do you recall the -- can you speak

19   specifically about that from your memory, like what

20   was his rating when the policy incepted, and what it

21   was when you looked at it?

22     A    From my recollection when the policy was

23   incepted it was rated as standard non-tobacco rate.

24     Q    Okay.  So would that be on Exhibit 53 in the

25   100 to 140?

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 64 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 58 of 122

1    committee.

2        Q    Are the people on the medical team medical

3    professionals?

OBJECTION
relevance

4        A    They're doctors.

5        Q    Doctors, okay.  So then -- so these are

6    guidelines that AXA has created to change the

7    guidelines that Gen Re puts out?

8        A    Or add to.

9        Q    Or add to, okay.

10        A    Because perhaps information was missing or

11    not addressed in the Gen Re guideline.

12        Q    When would you refer to this document?

13        A    Whenever I evaluated an individual who is age

14    70 and up.

15        Q    For new business?

16        A    For any type of business.

17        Q    So it could be reinstatements as well?

18        A    That's correct.

19        Q    At the top it says, Senior Applicant Medical

20    Checklist.  When they use the term applicant, does

21    that only apply to new business?

22        A    No.

23        Q    So that applies to reinstatements as well?

24        A    Yes.  An application is filled out for a

25    reinstatement.

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 71 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 59 of 122

1          Q    I see.  Did you review this in connection

2    with Malcolm Wiener's reinstatement?

3          A    Yes, I did.

4          Q    So just to go over it again.  You mentioned

5    low hemoglobin.  Where is that on this list?

6          A    That would be under 14, under two red flags.

7          Q    It says, Male hemoglobin less than 13?

OBJECTION
p. 71:1-72:23
relevance

8          A    I'm going from memory, it was 12.5.

9          Q    You said low serum albumin?

10         A    His, going from memory once again, was 3.5.

11   That's number 2 on the first.

12         Q    Memory loss?

13         A    Yes.  I would have considered that number

14   six.

15         Q    On this top part, Mild or worse dementia?

16         A    Yes.

17         Q    Those are the ones you could recall?

18         A    He also had a gait, he was noted to have gait

19   instability by his physician.

20         Q    Where would that --

21         A    I don't think that one was on here.

22         Q    Okay.  It references falls, but not gait

23   instability, correct?

24         A    I believe there was a fall in the records

25   going from memory, but I can't say 100 percent sure

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 72 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 60 of 122

1         A    Yes.

2         Q    And they don't make decisions based off of

3    those?

4         A    No.  It's just an alert that you need to

5    investigate further.

6         Q    So when we're talking about medical

7    insurability for a reinstatement, can you explain like

8    what the difference is between medical insurability

9    for a reinstatement versus new business?

10                   MR. CASSOT:  Object to the form.

11   BY MS. GUERTIN:

12        Q    What is the difference between the two?

13        A    Essentially I go through the same process and

14   come up with the same rating, but based on less

15   evidence.

16        Q    This is for a reinstatement?

17        A    Right.  Less medical evidence, because I'm

18   not getting the Paramed and the labs, and there's a

19   two-table tolerance.  So if Mr. X was standard, and

20   now he's a table B for reinstatement only, we would

21   allow the standard, but if it was new business, Mr. X

22   also applied for new business at the same time, then

23   he would be issued a table B policy.

24        Q    In your hypothetical he was standard when he

25   applied for the first policy?

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 79 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 61 of 122

1        A    That's correct.  At issuance, yes.

2        Q    So for --

3        A    And that assumes that it's more than five

4    years ago.  I should clarify.

5        Q    So for reinstatement you said you rely on

6    less evidence.

7        A    That's correct.

8        Q    Can you elaborate again on that?  What do you

9    mean by that?

OBJECTION
relevance
p. 79:5-80:4

10        A    If we go back to --

11        Q    Exhibit 52.

12        A    Yes, Exhibit 52, 99, 1499.  If you read the

13    first sentence under general overview, "Non-medical

14    age and amount underwriting requirements, e.g.,

15    inspection reports, motor vehicle records, financial

16    data, et cetera, generally should not be requested

17    unless the risk presented suggests a necessity for

18    these requirements.  Medical requirements, however,

19    should be consistent with the reinstatement guidelines

20    outlined in this document, and those normally

21    requested for new business if warranted."

22        Q    Okay.  So essentially all of the things

23    detailed there would be required for new business, but

24    for reinstatements only the APS?

25        A    And depending on the case we could request

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 80 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 62 of 122

1  grandfathered?

2      A    I'm not 100 percent sure, but it may mean

3  that this policy was issued before the IRS regulation

4  went into effect.

5      Q    Would that impact your decision about

6  reinstatement at all?

7      A    No.

8      Q    Do you know if reinsurance was involved in

9  the decision to reinstate in 2007?

10     A    I do not know.

11     Q    Can you tell by looking at that?

12     A    I cannot tell.

13              (Plaintiff's Exhibit 57, Reinstatement

14  Application for Life Insurance Bates stamped

15  MHW-001042 through 1045:  Marked for Identification.)

16  BY MS. GUERTIN:

17     Q    I'm showing you what's been marked as

18  Exhibit 57.  This is a copy of the 2008 reinstatement

19  application.  Do you recognize this document?

20     A    I viewed it first during discovery.

    OBJECTION
    relevance

21     Q    During your prep for today?

22     A    That's correct.

23     Q    You've referenced on a few occasions that you

24  would refer to the application, and if there were any

25  yes answers, then you would look to the details; is

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 87 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 63 of 122

1    that accurate?

Objection

86:23-87:16

Relevance; lack of personal
knowledge

2        A     That is correct.

3        Q     So if we look at this one as an example, here

4    we have a few yes answers; is that correct?

5        A     Yes, it is.

6        Q     So why don't you walk me through what you

7    would do in this case?

8        A     I would make sure that all of the questions

9    are answered, I would make note of any yes questions,

10   and then I would read the details.

11       Q     And what do the details here tell us?

12       A     Would you like me to read them?

13       Q     Yes, please.

14       A     "Four incidents of atrial fibrillation all of

15   which self-corrected by arrival or shortly after

16   arrival at hospital.  Doctor prescribed beta blocker."

17       Q     So in this case, with these details, what

18   would you do next?

19       A     I would determine whether I needed an

20   attending physician's statement or not.

21       Q     Would you in this case?

22       A     It would depend.  I don't know what the death

23   benefit was associated with this reinstatement.

24       Q     So the value of the death benefit would

25   dictate if you get the attending physician's

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 88 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 64 of 122

1   your evaluation of reinstatement?

2        A    No.

3        Q    Do you have any knowledge about the

4   difference between the 2008 reinstatement and the 2013

5   reinstatement?

6        A    I do not.

7             MS. GUERTIN:  Now would be a good time

8        for a brief break.

9             (Recess:  11:57 p.m. to 12:14 p.m.)

10  BY MS. GUERTIN:

11       Q    Do you know when these policies were

12  reinsured?

13       A    At issue.

14       Q    At issue, okay.  So would reinsurance have

15  been consulted for every reinstatement?

16       A    No.

17       Q    Why not?

18       A    It would depend on which policies were being

19  reinstated.

20       Q    Why?

21       A    Only policies that had facultative

22  reinsurance on them would need to have reinsurance

23  consulted.

24       Q    Okay.  So were all three of these policies

25  facultatively reinsured?

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 95 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 65 of 122

```
 1        A    No.

 2        Q    Do you know which ones were?

 3        A    Not off the top of my head.

 4             MS. GUERTIN:  Let's mark this.

 5             (Plaintiff's Exhibit 59, Document Bates

 6   stamped AXA001644 through 1654 with attached document:

 7   Marked for Identification.)

 8   BY MS. GUERTIN:

 9        Q    If you look at what's just been handed to you

10   as Exhibit 59.  Do you recognize this document?

11        A    Yes, I do.

12        Q    And can you tell me what this document

13   represents?  Feel free to flip through it if you need

14   to.

15        A    This is the Gen Re Source Life Underwriting

16   Manual, the AXA version.

17        Q    And is it the entire manual?

18        A    No, it is not.

19        Q    Selected sections of the manual?

20        A    That is correct.

21        Q    Did you pick the sections to be included

22   here?

23        A    Yes.

24        Q    And how did you choose those sections?

25        A    These are the sections that I utilized in the
```

OBJECTION
p. 95:5-96:3
relevance

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-3  Filed 06/24/20  Page 96 of 275
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 66 of 122

1    evaluation of Mr. Wiener's risk.

2         Q   For the 2013 reinstatement?

3         A   That is correct.

4         Q   Can we look at this also with respect to the

5    2008 reinstatement application specifically regarding

6    atrial fib.  So you testified, let me get it up to --

7    so just going back to that, the 2008 reinstatement

8    application talks about four incidents of atrial

9    fibrillation.  So where in this manual does it talk

10   about atrial fibrillation?

11        A   It is on page 1646 and 1647.

12        Q   So can you tell me, what does this -- can you

13   explain what this tells us here?

14        A   Okay.  There's different kinds of atrial fib.

15   There is, the first category is prior atrial

16   fibrillation when the person has been in sinus rhythm

17   for more than a year.

18        Q   What does that mean, in sinus rhythm?

19        A   They haven't had any episodes of atrial fib.

20   At least no known episodes of atrial fib, I should

21   say.

22        Q   So that's one category?

23        A   That's correct.

24        Q   The next category?

25        A   Is if they're currently in atrial

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 97 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 67 of 122

1   fibrillation, or they have been in atrial fibrillation

2   during the last year.

3        Q    And then is there another category?

4        A    Yes.  There is chronic atrial fibrillation.

5        Q    Okay.

6        A    And that is on page 1647.

7        Q    How do you --

8        A    I'm not done.  There is one more category.

9   The paroxysmal atrial fibrillation is the other one.

10       Q    And that's PFA for short?

11       A    PAF.

12       Q    PFA.

13       A    That's correct.

14                MR. REILLY:  What's at the top of the

15       page cut off?

16   BY MS. GUERTIN:

17       Q    Can you tell what's at the top of the page

18   1647 cut off?  Is it the same as what appears at the

19   bottom?

20       A    I believe it is.

21       Q    So how would you --

22       A    Oh, I know what it says now.  It says, Others

23   rate as chronic.

24       Q    Under current atrial fibrillation?

25       A    No.  On the top of page 1647.

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 98 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 68 of 122

1                    (Plaintiff's Exhibit 60, Reinstatement

2    of Life Insurance Bates stamped AXA000310 and 311:

3    Marked for Identification.)

4    BY MS. GUERTIN:

5        Q    Showing you what's been marked as Exhibit 60.

6    Do you recognize this document?

7        A    Yes, I do.

8        Q    And what is it?

9        A    It is the reinstatement for application that

10   I reviewed.

11       Q    So you've seen this before?

12       A    Yes, I have.

13       Q    Can you walk me through what you did once you

14   received this application?

15       A    Okay.  I check the name to make sure that the

16   system was correct, I looked at the occupation.

17       Q    Why would you look at the occupation?

18       A    There are certain occupations that can be

19   rated, dangerous occupations.

20       Q    Is historian a --

21       A    No, it's not.

22       Q    Not a dangerous occupation.

23       A    No, but I still review it on every case.

24            MR. CASSOT:  Can we go off the record

25       for just a second?

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-3  Filed 06/24/20  Page 103 of 275
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 69 of 122

1          MS. GUERTIN:  Sure.

2          (Off-the-record discussion.)

3          (Plaintiff's Exhibit 61, Reinstatement

4   Application for Life Insurance CT Form:  Marked for

5   Identification.)                    OBJECTION
                                        relevance

6   BY MS. GUERTIN:

7      Q    Back on the record.  Showing you what's been

8   marked as Exhibit 61.  Is it your understanding that

9   this is the Connecticut form that was submitted by

10  Mr. Wiener in connection with his 2013 reinstatement?

11     A    It is my understanding.

12     Q    And the one that we were just looking at

13  that's marked as Exhibit 60 was originally submitted

14  on a New York form; is that correct?

15     A    That's what it looks like.

16     Q    So when you took a look at this

17  reinstatement, you were looking at Exhibit 61,

18  correct?

19     A    That is correct.

20     Q    So now you left off saying you would look

21  at -- you would verify that the information is

22  correct.

23     A    Yes.

24     Q    And then what would you do?

25     A    I would check the occupation, as I previously

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-3  Filed 06/24/20  Page 104 of 275
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 70 of 122

1    A    It says that he's having recurrent night

2    sweats, it says that he's having a urinary retention

3    problem, it seems like, difficulty with sleep, he's

4    having vivid dreams, he's still fatigued.  It's also

5    noting memory loss, atrial fibrillation, hypertension,

6    benign prosthetic hypertrophy, sleep apnea, history of

7    sinusitis, a mitral valve prolapse.  It's telling me

8    he's had a surgical history of an appendectomy and a

9    tonsillectomy.

10    Q    Let's stop right there.  Can you tell --

11    well, do you know what PMH means?

12    A    Past medical history.

13    Q    Okay.  So now would those items that are

14    listed there be the doctor's diagnosis, or would that

15    be something that the patient told their doctor?

16    A    It could be either.

17    Q    How would you know?

18    A    I wouldn't know.  I wasn't a party to the

19    conversation.

20    Q    So it doesn't specify here?

21    A    It does not.

22    Q    So it's possible that Mr. Wiener might have

23    reported that he had AFib, but that might not be the

24    doctor's diagnosis?

25              MR. CASSOT:  Objection.

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 143 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 71 of 122

1              THE WITNESS:  I wouldn't know.          OBJECTION
                                                       relevance

2    BY MS. GUERTIN:

3        Q    What did you say BPH stands for?

4        A    Benign prosthetic hypertrophy.

5        Q    And what is that?

6        A    It's basically an enlargement of the prostate

7    so it's difficult for the person to urinate.

8        Q    And what is MUP?

9        A    It's MVP, mitral valve prolapse.

10       Q    What's that?

11       A    It's one of the valves that's in your heart,

12   and it's kind of flappy, floppy.

13       Q    When it shouldn't be?

14       A    Yes.

15       Q    So did any of this information impact your

16   assessment?

17       A    Yes.

18       Q    How so?

19       A    The memory loss, the sleep apnea, the atrial

20   fibrillation, and the hypertension notation just

21   alerted me to the fact that I would have to keep an

22   eye on his blood pressure through the rest of the

23   review of the APS.

24       Q    And then it looks like, what does habit/SH

25   mean?

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-3  Filed 06/24/20  Page 144 of 275
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 72 of 122

1       Q   Not yet?                                    Objection

2       A   And then the memory loss, and the          Non-responsive

3   intermittent AFib, atrial fibrillation.  10/28/13,

4   page 2468, diagnosis, atrial fibrillation, Patient

5   with MGUS, chronic memory, difficulties AFib with

6   concerns with difficulty with episodic memory issues.

7       Q   Can you tell me what the -- under diagnosis

8   it says atrial fibrillation, primary encounter

9   diagnosis.  What does that mean?

10      A   I'm not sure what the doctor meant here.

11      Q   Does the pulse rate have anything to do with

12  AFib?

13      A   It can.

14      Q   And what correlation?

15      A   So it's very rarely caught when they listen

16  to the pulse, but it would be irregular and elevated.

17      Q   And what's an elevated pulse?

18      A   Depending on the person's baseline, but

19  generally somebody who has a pulse over 100, but it's

20  depending on the person.

21      Q   Here in the paragraph at the bottom of this

22  page, kind of in the first third it says, "He has had

23  one occurrence with AFib with PR to 90."  Does that

24  indicate -- do you see that?

25      A   Yes, I do.

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-3  Filed 06/24/20  Page 187 of 275
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 73 of 122

1      Q   Is PR pulse rate?

2      A   No, it's not.

3      Q   What is it?

4      A   If we could go back to the EKG, I could show

5   you what it means.

6      Q   Okay, sure.

7      A   It's not related to this, but it would be a

8   way for me to show you what PR means.

9      Q   Okay.  What page are you looking at?

10     A   I am looking at page 2453.  When you look at

11  an EKG, you see this first little --

12     Q   Bump?

13     A   Yes.  The beginning of the bump is P, and the

14  end of the bump is R, and a measurement of that helps

15  determine if the person has atrial fib.  It's not on

16  this EKG.

17     Q   Okay.  But it's a measurement that they can

18  take?

19     A   Yes.

20     Q   So here they're saying recurrence of AFib

21  with PR to 90.  What does that mean?

22     A   I need to read it for a second.

23     Q   Sure.

24     A   This is speculation on my part, but I believe

25  that the PR measurement, because I can't see the EKG

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 188 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 74 of 122

1   which is zero risk factors, which is a flat extra of

2   $2 per thousand of coverage.  So that's different than

3   a table rating.

4        Q    What does that mean?

5        A    Okay.  So instead of it being a percentage,

6   so a one table rating is 25 percentage extra on the

7   premium.

8        Q    Okay.

9        A    This is a flat extra.  So for every thousand

10  dollars of premium, we would add $2 -- I mean, every

11  thousand dollars of death benefit, we would have $2 to

12  the premium per thousand.

13       Q    I see.  So then did he have any of these risk

14  factors for progression for MGUS to myeloma?

15       A    From what I saw, he did not, other than the

16  anemia, but his hemoglobin was not below 10, and I

17  considered him asymptomatic even though I wasn't 100

18  percent sure he was asymptomatic, because he had only

19  had a -- the recurrent respiratory infection, so I

20  gave him the benefit of the doubt.

21       Q    Back up a little bit, sorry.  We were talking

22  about this risk factors section here, and then you

23  started to talk about the hemoglobin.  Did you jump

24  back up to the top of the page?

25       A    Yes.  That's required criteria, I'm sorry.

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-3   Filed 06/24/20   Page 201 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 75 of 122

1        Q    Okay.  So required criteria, serum M protein,

2    what's that?

3        A    It's a protein that they -- in the SEP panel

4    that they use.

5        Q    Was that involved here?                    OBJECTION
                                                          relevance

6        A    No.

7        Q    So you said asymptomatic?

8        A    He wasn't 100 percent asymptomatic, but I

9    considered him asymptomatic, because I wasn't sure

10   what was causing those recurrent respiratory

11   infections.

12       Q    Okay.  And then anemia, is that what you --

13   did you consider him anemic?

14       A    No, I did not, because his hemoglobin was

15   greater than ten.

16       Q    So you're saying under the MGUS rating you

17   gave him the zero risk factor, which would give you

18   the $2 per thousand of coverage?

19       A    Yes, I did.

20       Q    So how did that play into the assessment of

21   the reinstatement application?

22       A    That would have been equal to about 15 debits

23   or a half a table.

24       Q    So the dollar values that are listed here --

25       A    There's a conversion.

PLANET DEPOS
888.433.3767 / WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-3  Filed 06/24/20  Page 202 of 275
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 76 of 122

1      ROUGH ASCII -- NOT CERTIFIED

2      N O T I C E

3  This transcript is an UNCERTIFIED ROUGH DRAFT TRANSCRIPT.

4  It contains raw output from the court reporter's

5  stenotype machine translated into English by the court

6  reporter's computer, without the benefit of proofreading.

7  It will contain untranslated steno outlines,

8  mistranslations (wrong words), and misspellings.  These

9  and any other errors will be corrected in the final

10  transcript.  Since this rough draft transcript has not

11  been proofread, the court reporter cannot assume

12  responsibility for any errors therein.

13  This rough draft transcript is intended to assist

14  attorneys in their case preparation and is not to be

15  construed as the final transcript.  It is not to be read

16  by the witness or quoted in any pleading or for any other

17  purpose and may not be filed with any court.

18

19

20

21

22

23

24

25

---

**LEGEND**
**DESIGNATIONS BY COUNSEL**

**Plaintiff: Text in yellow**

**Defendant: Text in blue**

**Both Parties: Text in green**

---

Case 3:18-cv-00106-RJC-DSC   Document 84-4   Filed 06/24/20   Page 1 of 112
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 77 of 122
file:///msplIc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

1    DEPOSITION OF HALLIE HAWKINS, VOLUME 2

2         OCTOBER 25, 2017

3

4      (Commenced:  11:17 a.m.)

5      THE VIDEOGRAPHER:  Here begins Tape

6  Number 1 in the videotape deposition of Hallie

7  Hawkins, Volume 2, in the matter of Malcolm H.

8  Wiener plaintiff versus AXA Equitable Life

9  Insurance Company et al. defendants in the

10  United States District Court Southern District

11  of New York, Case Number 116-CV-04019-ER.

12  Today's date is October 25, 2017.  The time on

13  the video monitor is 11:17 a.m.  The

14  videographer today is Kristin Zarnestske

15  representing Planet Depos.  This video

16  deposition is taking place at the firm of

17  Morrison & Mahoney at One Constitution Plaza,

18  Hartford, Connecticut.  Would counsel present

19  please identify themselves for the record.

20      MR. REILLY:  Lawrence Reilly for the

21  plaintiff.

22      MS. BIKAKIS:  Nicole Bikakis the

23  plaintiff.

Case 3:18-cv-00106-RJC-DSC   Document 84-4   Filed 06/24/20   Page 2 of 112

Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 78 of 122

file://mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

4 here is that --

5     Q   Answer the question that I posed to you first,

6 and then I'll ask you to explain.

7     A   All right.  Can you ask me one more time?

8     Q   Yes.  When you say that it could lead to a

9 decline or that it generally leads to a decline, that

10 implies that it might not lead to a decline; isn't that

11 correct?

12     A   Yes.

13     Q   So tell me circumstances under which it would

14 not lead to a decline.

15     A   If somebody had a low albumen, but the next

16 value came up, then we probably would not decline.  So for

17 example, if somebody was at 3.6 and five months later they

18 went back to the doctor and they were now at 3.9, we

19 wouldn't decline.

20     Q   So a low albumen level that then goes up, you

21 would not decline?

22     A   Yes, but if albumen levels are trending down, we

23 would decline.

24     Q   Okay.  Do you remember what the date of the last

25 albumen reading was --

13

1     A   No.

2    Q    -- that you had in your records when you made

3    your decision on reinstatement of Malcolm Wiener's

4    policy?

5    A    No.

6          MR. REILLY:  Why don't we just take

7    a moment break.  I need to get some documents,

8    and we're probably better doing that off the

9    record.

10          THE VIDEOGRAPHER:  The time is 11:30

11    a.m.  We're going off the record.

12          Off the record:  11:30 a.m to 11:35

13    a.m.

14          THE VIDEOGRAPHER:  The time is 11:35

15    a.m.  We're back on the record.

16   BY MR. REILLY:

17    Q    Ms. Hawkins, we took a few minutes off the

18   record to get deposition exhibits in front of you?

OBJECTION
relevance
13:23-14:3

19    A    Yes.

20    Q    So you have in front of you Gary boid's records

21   which are marked as Exhibit 63?

22    A    63 is correct.

23    Q    We have in front of you the AXA document

24   concerning what is this?

25    A    That's the underwriting manual.

14

Case 3:18-cv-00106-RJC-DSC    Document 84-4    Filed 06/24/20    Page 14 of 112
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 80 of 122
file:///mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

1    Q    Underwriting manual Exhibit 59 and that's only

2  excerpts right?

3    A    Only excerpts that's correct.

4    Q    And your notes that's marked Exhibit 62 it looks

5  like?

6    A    Yes, that's correct.

7    Q    So I think the last question I had asked you

8  pertained to the date of the last albumen level test --

9    A    Yes.

10    Q    -- that you based your reinstatement evaluation

11  on.  Tell us the date of that and tell us where you're

12  finding that, please?

13    A    Exhibit -- Plaintiff's Exhibit 63 in laboratory

14  results dated May 8, 2013, the serum albumen is reported

15  at 3.5.

16    Q    Okay.  And according to Exhibit 59, what is the

17  level that they're looking for?

18    A    I'm reading number 2, albumen 3.8 or less.

19    Q    And is that a decline or red flag or concern?

20    A    It's usually a decline.

21    Q    What was the date that you were performing your

22  analysis for the reinstatement application?

23    A    I don't remember.

24    Q    Can you give me some rough idea?

25    A    It was -- not really.  It was either late 2013

Case 3:18-cv-00106-RJC-DSC    Document 84-4    Filed 06/24/20    Page 15 of 112
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 81 of 122
file:///mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

1  or early 2014, but I cannot remember at this time.

2      Q    Okay.  So I believe the policies were terminated

3  in December of 2013.  So would that indicate that your

4  reinstatement analysis was performed in the early months

5  of 2014?

6      A    To the best of my memory, but I can't remember

7  right now.

8      Q    Okay.  All right.  So the documents will advise

9  us about that maybe as we go along.  So you were relying

10  on an albumen test that was from May of 2013?

11     A    Yes.

12     Q    If you knew that an applicant for reinstatement

13  was taking testosterone supplements, would that affect

14  your analysis on any of these points including albumen

15  levels?

16     A    We have guidelines regarding testosterone, but I

17  don't have them in front of me.

18     Q    Do you know what they are?

19     A    Not off the top of my head I don't.

20     Q    I think I just asked you this.  Are you aware of

21  of any context between testosterone levels and albumen

22  levels?

23     A    No, I'm not.

24     Q    Do you know if the guidelines speak to that at

Case 3:18-cv-00106-RJC-DSC    Document 84-4    Filed 06/24/20    Page 16 of 112
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 82 of 122
file:///mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

13 tests.

14   Q   But on a new application, I understood you to

15 say that you would send out somebody for an insurance

16 examination?

17   A   That's for new business only.  We don't require

18 that on a reinstatement.

19   Q   Okay.  So if a person is applying for a

20 reinstatement, is there any circumstance under which AXA

21 would require them to have any kind of blood test at

22 all?

23       MR. CASSOT:  Object to the form.

24   A   Not that I -- not to my knowledge.  Wait can you

25 say that one more time?  I'm sorry?


22


1       MR. REILLY:  Can you read that back?

2       (The last question was read

3       by the Court Reporter.)

4   A   Not from a vendor, so where we were talking

5 about where the examiner goes out.

6 BY MR. REILLY:

7   Q   I don't understand your answer.

8   A   Okay.  We were talking a about the difference

9 between new business and pay change which --

10 reinstatement, I'm sorry.

file:///msplcc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

11    Q    Reinstatement, thank you.

12    A    Yes.  All right.  For new business only, we send

13  an examiner out, but we do not do that for reinstatement.

14  So it's two different --

15    Q    I understand that.

16    A    -- requirements.  Okay.

17    Q    So my question is:  Is there any circumstance

18  when there is a reinstatement application where AXA would

19  require a blood test whether it's done by a vendor or done

20  by the doctor or done by the man on the moon, it doesn't

21  matter, any circumstances?

22    A    I can't speak for every Underwriter at AXA, but

23  we're not supposed to.  Can I say that an Underwriter at

24  AXA has never -- has ever sent somebody out?  Yes, they

25  could have, but I would not.


                                23


1    Q    And you trian --

2    A    And that is not the guideline.

3    Q    You train underwriters?

4    A    Right, but some have been there before I started

5  training, so...

6    Q    I guess let's just to bring this home.

7    A    Yes.

8    Q    If you have blood tests from somebody applying

file://mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

9  for a reinstatement and that blood test is a year old, and

10  you've told me that if -- if their albumen level dipped

11  below the acceptable level, but then subsequently came up

12  to the acceptable level, that you would not decline?

13      A   I may not decline, yes.

14      Q   So if the only data that you have is a year old,

15  do you do anything to find out what the current numbers

16  are?

17      A   No.

18      Q   Because the person could be in perfect health,

19  right?

20          MR. CASSOT:  Object to the form.

21  BY MR. REILLY:

22      Q   And you don't know?

23          MR. CASSOT:  Object to the form.

24  BY MR. REILLY:

25      Q   Is that correct?



OBJECTION
relevance
23:8-24:24

24

1           MR. CASSOT:  Object to the form.

2      A   I can't read the future.  I only have the

3  evidence as presented in front of me.

4  BY MR. REILLY:

5      Q   Right.  I'm not asking you to read the future.

6  I'm asking you to read the present when you are there

file:///msplc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

7  reading the records.  So if the record that you have is a

8  year old, do you do anything to update the data in that

9  record to find out what the actual current medical status

10  of that person is?

11      A   No.

12      Q   So if the data that you get from the doctor is a

13  one-year-old or 17-month-old blood lab, that's what you're

14  going to rely on?

15      A   Yes.

16      Q   Even though their numbers, at the moment that

17  you're actually performing your analysis, the numbers

18  might be stellar, they might be above all levels that are

19  required, it doesn't matter to you?

20          MR. CASSOT:  Object to the form.

21      A   I have no idea if that happened or not.  There's

22  no way I could read that, know the future.

23  BY MR. REILLY:

24      Q   Okay.  Well, let's get into that.  In this

25  particular case, you knew the name and address of Malcolm

25

1  Wiener's treating physician, right?

2      A   I knew it was Dr. Barry Boyd, yes.

3      Q   And I think the reinstatement application

4  provided you with Mr. Boyd's address in Greenwich.  Do you

file://mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

19  where an underwriter makes a mistake in reading or

20  interpreting medical records?

21          MR. CASSOT:  Object to the form.

22      A    We talk to the underwriter.  We let them know

23  about the mistake so it's not repeated.

24  BY MR. REILLY:

25      Q    How often does the audit procedure find mistakes


46


1  by underwriters?

2      A    Our -- I don't have exact numbers, but our

3  accuracy rate for the month of August was 98.4 or 5

4  percent.  And we reviewed 3 -- I'm sorry, 240 --

5  approximately 240 cases

6      Q    And that's all new business, right?

7      A    Yes.

8      Q    I guess we should clarify.  When you say the

9  accuracy rate was 98.4 or 5 percent, that is the auditors

10  reviewing the medical records to see if they agree with

11  the underwriter's review of the medical records?

12      A    That is correct.

13      Q    At any point are the doctors who created those

14  medical records contacted to see whether they agree with

15  the auditors or the underwriters?

16      A    Definitely not.

Case 3:18-cv-00106-RJC-DSC   Document 84-4   Filed 06/24/20   Page 49 of 112
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 87 of 122
file:///mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

17    Q    And you said definitely not.  Why is it

18  definitely not?

19    A    Well, because we don't want to go back and talk

20  to a doctor after we've already -- most of these cases

21  have been issued.  So most of the time when somebody makes

22  a mistake, it's in favor of the client.  So for example,

23  somebody -- we issued a policy at our best class, and they

24  should have been standard.  So we don't want to take the

25  policy back from the client, either, because we rated it

47

1  at the wrong rate.  So we would definitely not contact the

2  doctor.

3    Q    Okay.  Do you know if AXA has ever been

4  contacted by an insured where the insured asked them to

5  contact the treating doctor?

6    A    I can't answer that question.

7    Q    Would you feel that an underwriter appropriately

8  contacted the doctor if the client contacted the company

9  or the company's agent and encouraged them to contact the

10  treating doctor?

11    A    I can't answer for every underwriter.  So I

12  don't know.

13    Q    But how about for you?  Do you think it would be

14  appropriate for you to contact the treating doctor under

OBJECTION
relevance
foundation

Case 3:18-cv-00106-RJC-DSC    Document 84-4    Filed 06/24/20    Page 50 of 112
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 88 of 122
file://mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

15 those circumstances?

16    A   If the agent contacted me?

17    Q   Right.

18    A   Is that what you're asking me?

19    Q   Well, the first question would be:  If the

20 client contacted either AXA directly or the agent and

21 encouraged AXA to reach out directly to the treating

22 physician, do you think it would be appropriate for the

23 underwriter to then contact the treating physician?

24    A   No.

25    Q   Even though the client has consented to it and

48

1 encouraged it?

2    A   Because we cannot identify over the phone that

3 Mr. Smith is really Mr. Smith.  So we don't know if the

4 person giving permission is Mr. Smith.

5    Q   So you're saying you think that somebody could

6 fraudulently contact AXA and ask you to contact a

7 stranger's treating physician in connection with their

8 application for reinstatement of their life insurance

9 policy?

10    A   Yes.

11    Q   Has that ever happened?

12    A   I don't know, but people commit fraud all the

Case 3:18-cv-00106-RJC-DSC   Document 84-4   Filed 06/24/20   Page 51 of 112
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 89 of 122
file:///msplllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

13  time.

14      Q   And AXA can't concede of any fraud prevention

15  steps that they might take to ensure that that hasn't

16  happened?

17          MR. CASSOT:  Object to the form.

18      A   A written request.

19  BY MS. BIKAKIS:

20      Q   A written request from the client?

21      A   With his signature.

22      Q   So if the client submitted something in writing

23  encouraging that to happen, let's say writing or an email,

24  would you then deal it appropriate to reach out to the

25  treating physician?

49

1      A   Only in writing, not in email.

2      Q   Has AXA ever advised their clients that they

3  would accept such a request from the client?

4      A   That's generally worked out between the agent

5  and the client.

6      Q   Do the agents know that they're supposed to

7  encourage clients to put that in writing?

8          MR. CASSOT:  Object to the form.

9      A   If they call the underwriter, the underwriter

10  would tell them to have Mr. Smith send a letter?

Case 3:18-cv-00106-RJC-DSC    Document 84-4    Filed 06/24/20    Page 52 of 112
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 90 of 122
file:///mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

20     Q   Okay, of unknown significance reported by a

21  doctor, and you don't know how long he's had it.  Did I

22  interpret that correctly?

23     A  Yes.

24     Q  I'll be an underwriter by the time this is done.

25  Next is 347 SZ#.


59


1     A  That is a cerebral incident.

2     Q  What is a cerebral incident?

3     A  It could be a transient ischemic attack.  It

4  could be a cerebral vascular accident or what you might

5  call a stroke.

6     Q  And tell me again what does S mean.

7     A  That means that I suspected he had a stroke or

8  some type of cerebral vascular accident, but I didn't have

9  enough information in file.  It's equivalent to the K.  I

10  don't know the exact details.

11     Q  Z you say reported by a doctor?

12     A  Yes.

13     Q  Pound # means you don't know when it happened?

14     A  Or if there was more than one.  I just didn't

15  have enough detail.  So the pound # means we don't have

16  enough details to tell you more basically.

17     Q  We'll come back to that.

Case 3:18-cv-00106-RJC-DSC   Document 84-4   Filed 06/24/20   Page 63 of 112

Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 91 of 122

file:///mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

18      What does 157 KZ# mean?

19      A   I'm going from memory, but I think it's related

20  to the MUGIS, the mono COLONAL gammopathy

21  g-a-m-m-o-p-a-t-h-y of uncertain significance.

22      Q   Back to 208 SZ#, you did not remember that?

23      A   No, I do.  That's a memory loss suspected.

24      Q   Would you agree with me that as a result of

25  these MIB codes that you reported, that Mr. Wiener has

S

Objection

60:24-61:14

Improper expert opinion
Speculation

Foundation

Lack of personal
knowledge

60

1  been rendered uninsurable?

2      A   No.

3      Q   You disagree?

4      A   Yes.

5      Q   Why?

6      A   Because any other insurance company that he goes

7  to has to investigate all these codes, which means that

8  they need to get these records from whoever his attending

9  physicians is.

10      Q   Where are you getting that?  Says who?  Who says

11  they have to investigate further?

12      A   The MIB rules and regulations.  It's in the MIB

13  handbook.  It's clearly states you can't make an

14  underwriting decision based off the codes.

15      Q   Did Mr. Wiener have any MIB codes when you --

Case 3:18-cv-00106-RJC-DSC    Document 84-4    Filed 06/24/20    Page 64 of 112
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 92 of 122
file://mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

16  pardon me.  Withdrawn.

17       Did Mr. Wiener have any MIB codes prior to your

18  reporting of these codes?

19  A   I don't know.

20  Q   And is it your belief that these codes were

21  entered -- withdrawn -- -- when did you enter these in

22  you're saying please report these, and the date of the

23  email is March 12 of 2014?

24  A   I didn't report them, so I don't know what day

25  they were reported.  That's the day that I asked that they

1  be reported.

2  Q   Okay.  Do you know what materials were sent off

3  to the reinsurance company in connection with her Mr.

4  weiner's application for reinstatement?

5  A   I do not.  Somebody else did that for me.

6  Q   Do you have any idea what records are supposed

7  to be sent?

8  A   The attending physician statement from Dr. Boyd

9  and also Exhibit 61, the reinstatement application for

10  life insurance.

11  Q   Anything else?

12  A   I can't speak to what else was in the file at

13  this time, but everything in the file -- most of these

Case 3:18-cv-00106-RJC-DSC   Document 84-4   Filed 06/24/20   Page 65 of 112
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 93 of 122
file:///mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

14  things in the file should have been sent.

15  Q   Are your notes sent over to the reinsurer?

16  A   No.

17  Q   Are your MIB codes sent or over to the

18  reinsurer?

19  A   No.  They check them themselves.

20  Q   Do you ever speak with the reinsurance people

21  about a reinstatement application?

22  A   I have not.

23  Q   Did you in Malcolm's case?

24  A   Not to the best of my recollection.

25  Q   What was the name of the reinsurance company for

62

1  Malcolm's policies?  Do you know?

2  A   I believe it was RGA, but I'd have to review the

3  records to confirm that.

4  Q   Do you know if all three policies were

5  reinsured?

6  A   I believe only one was, but I don't have my

7  notes in front of me.  There's a -- in the evidence,

8  there's a screen shot with that information.

9  Q   And do you know if you had any communication

10  with RGA or any reinsurance company concerning Malcolm

11  Wiener's application?

Case 3:18-cv-00106-RJC-DSC    Document 84-4    Filed 06/24/20    Page 66 of 112
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 94 of 122
file://mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

8    Q   Miss Hawkins, I want to pick up close to where

9 we LEFT off, and that is with the submission of Mr.

10 Wiener's medical records to the reinsurance company.  Do

11 you recall testifying about that?

12    A   Yes.  I had asked that they be sent to

13 reinsurance.

14    Q   I'm showing you Exhibit 61 which Again is

15 Mr. Wiener's reinstatement application, the second page of

16 which contains the authorization to obtain health

17 insurance.  Is there anything in that document that

18 authorized AXA to send Mr. Wiener's personal medical

19 information to a reinsurer?

20    A   I need to review it.

21    Q   Please.

22    A   Right here it says, "I/we understand that the

23 information obtained will be used by the company's to

24 determine my, r, eligibility for life insurance coverage

25 and such other uses specified in accordance with the

OBJECTION
relevance

65

1 underwriting practices attached to this application."

2       THE VIDEOGRAPHER:  Excuse me.  You need your mic

3 on.

4       THE WITNESS:  do you need me to

5 repeat it?

Case 3:18-cv-00106-RJC-DSC   Document 84-4   Filed 06/24/20   Page 69 of 112
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 95 of 122
file://mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

6          THE VIDEOGRAPHER: No.

7 BY MR. REILLY:

8      Q   And you believe that authorized sending

9 Mr. Wiener's medical documents to a third-party company?

10     A   Yes.

11          MR. CASSOT: Object to the form.

12 BY MR. REILLY:

13     Q   But you do not read the HIPAA authorization as

14 allowing you to pick up the phone and call Dr. Boyd?

15     A   That's correct.

16     Q   Let me show you Exhibit 59 which contains I

17 think the second page AXA document 001645. It's called

18 the senior applicant medical checklist ages 70 and up.

19 Were you a part of the process whereby this list was

20 created?

21     A   No.

22     Q   Do you know when that was instituted?

23     A   I don't know exactly when.

24     Q   Give me your best understanding about when it

25 was instituted.

OBJECTION
relevance


66


1     A   Somewhere between 2010 and 2012.

2     Q   Was there anything like the senior checklist in

3 place before 2010, 2012?

Case 3:18-cv-00106-RJC-DSC    Document 84-4    Filed 06/24/20    Page 70 of 112
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 96 of 122
file://mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

21     A    Usually it is put in the system and somebody in

22   pay change alerts me that the case is in the system.

23     Q    All right.  And has it been assigned to you or

24   do you get to choose which one you want to look at?

25     A    No, it's assigned.


72

1      Q    Who assigns it to you?

2      A    The pay change representative.

3      Q    And do we know who that is in this case?

4      A    Sandra [HRUF].

5      Q    So once the matter is assign to you, you're

6    alerted electronically, some kind of e-mail or?

7      A    Yes correct.

8      Q    Equivalent of email?

9      A    Uh-huh.

10     Q    Do you look at a paper file or electronic

11   file?

12     A    In this case I believe it was electronic.

13     Q    All right.  When is your decision due from

14   underwriting on that reinstatement application?

15     A    We don't have a due date.  I am supposed to

16   review the reinstatement application and notify the pay

17   change rep of what I need.  And then they handle it until

18   the requirement of what I need comes back.  And then I'm

OBJECTION
relevance
72:13-73:13

Case 3:18-cv-00106-RJC-DSC    Document 84-4    Filed 06/24/20    Page 77 of 112
Case 3:18-cv-00106-RJC-DSC    Document 111    Filed 08/27/20    Page 97 of 122
file:///mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

19  supposed to review it and let the pay change rep know my

20  decision.

21     Q   Okay.  So in this case, you use the phrase what

22  you need?

23     A   Right.

24     Q   In this case, what did you need?

25     A   The doctor's records.

73

1     Q   Okay.  And you people call that the --

2     A   APS.

3     Q   -- attending physician statement, APS?

4     A   Yes, that's correct.

5     Q   In this this case the APS was a photocopy of

6  Dr. Boyd's records, correct?

7     A   I'm not sure how they got it, but it looks like

8  a photocopy.

9     Q   Okay.  What else could it be?

10     A   I don't know, but it could have been

11  electronically --

12     Q   Okay.  It's a copy?

13     A   Right.

14     Q   All right.  There are times when an APS comes to

15  you in the forms of an actual letter written by the

16  doctor; is that correct?

Case 3:18-cv-00106-RJC-DSC   Document 84-4   Filed 06/24/20   Page 78 of 112
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 98 of 122
file:///mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

1  say assessment and then list impairments.

2    Q    So you're looking for other data in the records

3  to support the conclusion that this is an actual medical

4  diagnosis as opposed to what the patient said?

5    A    I could, yes, but sometimes we don't know.

6    Q    Do you just assume that everything that is not

7  in quotes and not directly ascribed by the doctor to the

8  patient, do you assume that everything else is from the

9  doctor?

10    A    Yes.

11    Q    Have you ever had occasion to consider an

12  application either a new business or reinstatement where

13  you saw preexisting MIB codes and then you looked at the

14  medical records and disagreed with MIB codes?

15    A    Yes.

16    Q    How often does that happen?

17    A    Very rarely.

18    Q    If a patient is -- withdrawn.

19        If a client is reported to the MIB has having

20  had a stroke, does that render that client uninsurable?

Objection

Improper expert opinion

Foundation

21    A    No.

22    Q    Does it render the client practically

23  uninsurable?

Objection

Improper expert opinion

Foundation

24    A    No.

25    Q    Can you envision a circumstances where a life

file:///mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]

1  insurance company would issue a life insurance policy to

2  someone who has reported to have a stroke?

3     A    Yes.

4     Q    Have you ever seen that?

5     A    Yes.

6     Q    Which company were you with?

7     A    If -- we can actually insure somebody who's had

8  a stroke after a certain amount of time.

9     Q    What time?

10    A    I'd have to look at the manual.

11    Q    Take a look at the documents in front of you and

12  tell me if you can answer that question.

13    A    I just need a moment.  Yes, I can answer that

14  question.

15    Q    Please.

16    A    I am looking at exhibit --

17    Q    Exhibit 59?

18    A    Exhibit 59.

19    Q    And the page is what?

20    A    And page number AXA 1649.  Depending on the type

21  of of stroke, at age -- after one year they could have a

22  rating of -- a table rating.

23    Q    Which would be plus points on that table that we

24  looked at earlier, right?

25    A    Plus debits, yes, that's correct.

Case 3:18-cv-00106-RJC-DSC   Document 84-4   Filed 06/24/20   Page 88 of 112
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 100 of 122
file:///mspllc-dc1/Charlotte-NC-Skufca/Company%20Data/Skufca/Active%20Clients-%20KLT/Hawkins,%20Hallie%20part%202.txt[6/23/2020 3:44:39 PM]



# Planet Depos

*We Make It Happen™*

# Transcript of Sandra Huffstetler

**Date:** August 30, 2017
**Case:** Wiener -v- AXA Equitable Life Insurance Company, et al.

| LEGEND | | |
|---|---|---|
| **DESIGNATIONS BY COUNSEL** | | |
| Plaintiff: Text in yellow | | |
| Defendant: Text in blue | | |
| Both Parties: Text in green | | |

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

1               UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF NEW YORK
2

3

4    MALCOLM H. WIENER,

5                    Plaintiff,

6         vs.                    Case No. 1:16-cv-04019-ER

7    AXA EQUITABLE LIFE INSURANCE
     COMPANY, DAVID HUNGERFORD, AXA
8    ADVISORS, LLC, AND AXA NETWORK, LLC,

9                    Defendants.

10

11

12   DEPOSITION OF:    SANDRA HUFFSTETLER

13   DATE:             August 30, 2017

14   TIME:             11:10 a.m.

15   LOCATION:         15720 Brixham Hill Avenue

16                     Suite 300
                       Charlotte, North Carolina
17
     TAKEN BY:         Counsel for the Plaintiff
18
     REPORTED BY:      Elaine L. Grove-DeFreitas,
19                     Certified Court Reporter

20

21

22

23

24

25

```
 1    said?  I'm sorry.
 2              THE WITNESS:  If the form was in good
 3    order.
 4              MR. CASSOT:  In good order.  Thank you.
 5    BY MS. GUERTIN:
 6         Q.   If it wasn't, what would you do?
 7         A.   We would write out for the omitted
 8    information.
 9         Q.   Like reach out to the client?
10         A.   Yes.  We would mail a letter to the
11    customer.
12         Q.   What does AWD stand for, if you know?
13         A.   I don't know.
14         Q.   Do you know what it is?
15         A.   Yes.  Our imaging workflow system.
16         Q.   Is it a computer program of some sort?
17         A.   Yes, it's on the computer.
18         Q.   Okay.  And how do you use that system?
19         A.   That's where we -- that's where we get
20    all of our requests in the system and how we process
21    and move work between the reinstatement area and the
22    Underwriting Department, and we add our notes and
23    comments for each case.
24         Q.   So it's between departments?
25         A.   Yes.
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 17 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 103 of 122

```
 1          Q.   Do you know what TAI stands for?

 2          A.   No.

 3          Q.   Okay.  Do you know what that is?

 4          A.   Yes.

 5          Q.   Can you describe it for me?

 6          A.   That shows whether a policy is reinsured

 7   or not.  It's a reinsurance system.

 8          Q.   Reinsurance info?

 9          A.   Yes.

10   (Previously Marked Exhibit No. 60, 12-18-13 AMIRA

11   Reinstatement Application, was referenced)

12   BY MS. GUERTIN:

13          Q.   Great.  I'm going to show you what was

14   previously marked as Plaintiff's Exhibit 60.  Take a

15   look at this for me.
```

OBJECTION
relevance
p. 17:13-19:9

```
16          A.   Okay.

17          Q.   Do you recognize this document?

18          A.   Yes.

19          Q.   Okay.  Can you tell me what it is?

20          A.   It's our Reinstatement Application, the

21   AMIRA form.

22          Q.   And just for the record, this is the

23   application dated December 18th, 2013.

24               Can we go off the record for a second?

25                    (Off-the-record discussion)
```

```
 1   BY MS. GUERTIN:

 2        Q.   So what we just discussed is that this

 3   Reinstatement Application is the New York form.  Is

 4   that correct?

 5        A.   Yes.

 6        Q.   And that Mr. Wiener later filled out a

 7   form dated December 23rd.  That was the Connecticut

 8   form.  Correct?

 9        A.   Correct.

10        Q.   And these are substantially the same, so

11   I'm going to ask you some questions about this

12   because this is what we have today in front of us.

13   Okay?

14        A.   Okay.

15        Q.   Did you review this Reinstatement

16   Application?

17        A.   Yes.

18        Q.   Okay.  And can you tell me what you --

19             MR. CASSOT:  Hold on a second.  Is

20   anybody on the phone?

21             I just got a text from Eileen that they

22   all lost the connection.

23                  (A break transpired)

24   BY MS. GUERTIN:

25        Q.   So back to Exhibit 60, we are looking at
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-5  Filed 06/24/20  Page 19 of 138
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 105 of 122

1    this Reinstatement Application.  What did you -- you

2    said you reviewed it.  Correct?

3          A.    Correct.

4          Q.    Okay.  What did you review?

5          A.    I reviewed the policy numbers and the

6    insured's name and compared it in our system to make

7    sure that it was the correct policy numbers being

8    requested and that the form was completed accurately

9    and all details were provided.

10         Q.    Okay.  And was everything accurate, to

11   your recollection?

12               MR. CASSOT:  Object to the form.

13   BY MS. GUERTIN:

14         Q.    Do you recall if you needed to reach out

15   for additional information?

16         A.    I don't recall.

17         Q.    Besides the fact that the form is wrong.

18         A.    I don't recall.

19         Q.    When you get an application like this do

20   you have to input information into a system?

21         A.    No.

22         Q.    No?  Okay.  What did you do with the

23   application at that point?

24         A.    I actually -- I believe I would have

25   forwarded it to Underwriting.

OBJECTION
relevance
p. 19:19-20:3

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 20 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 106 of 122

1    application.

2            A.    Correct.

3    (Previously Marked Plaintiff's Exhibit No. 52, Life

4    Underwriting Release No. 11-05, was referenced)

5    BY MS. GUERTIN:

6            Q.    So let me show you what has previously

7    been marked as Plaintiff's Exhibit 52.

8                 MS. GUERTIN:    And for the benefit of my

9    client, this is tab 22 in your binder, Carolyn.

OBJECTION
relevance
p. 46:3-47:11

10   BY MS. GUERTIN:

11           Q.    Do you recognize this document?

12           A.    No.

13                 MR. CASSOT:    The entire document, or do

14   you want to go to a specific page and ask if she

15   recognizes that page?

16   BY MS. GUERTIN:

17           Q.    Okay.  Do you recognize -- on the second

18   page of the document do you recognize the table

19   that's included there?

20           A.    Yes.

21           Q.    Okay.  Is this table what was in effect

22   at the time of Malcolm Wiener's reinstatement

23   application?

24           A.    Yes.

25           Q.    Okay.  How would you have seen this

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 47 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 107 of 122

```
1   table if you did not receive this Life Underwriting

2   Release?

3          A.   We have a service operation procedure

4   manual.

5          Q.   What is that?

6          A.   It's -- how do I explain?  It just shows

7   us how to process reinstatements.

8          Q.   Okay.  And that's not the documents that

9   we were previously looking at as Exhibit 50 or 51?

10         A.   No.

11         Q.   But it would contain this chart.

12         A.   Yes.

13         Q.   Okay.  You have never seen this Life

14  Underwriting Release before?

15         A.   No.

16         Q.   Okay.  So it's not something you would

17  refer to?

18         A.   No.

19         Q.   But looking at the chart, it seems -- is

20  it accurate to say the difference between this chart

21  and the previous chart we were looking at is that

22  this one does have riders and features in certain

23  rows?

24         A.   Yes.

25         Q.   Okay.  So in this case, do you recall --
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-5  Filed 06/24/20  Page 48 of 138
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 108 of 122

1    65 percent.

2         Q.    65 percent maybe?  Okay.  Can you

3    recall -- Okay.  That's fine.

4              Do you know -- not with respect to this

5    exhibit that's in front of you, but do you know what

6    "Paid up extended term" means?

7         A.    It's a whole life policy that has value

8    that when a policy is not paid it can go under --

9    the value on the policy can purchase additional

10   insurance to keep the policy in force under the paid

11   up extended term.

12        Q.    Do you know which, if Malcolm Wiener's

13   policies were paid up extended term or non-paid up

14   extended term?

15        A.    They were non.

16        Q.    They were non-paid up extended term.

17   And how does whether they were paid up extended term

18   or non-paid up extended term policies impact

19   reinstatement?

20        A.    I mean, based on our guidelines, they

21   could be reinstated.

22        Q.    Could they not be reinstated if they

23   were paid up extended term?

24        A.    Yes.

25        Q.    So can you describe the difference for

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 53 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 109 of 122

```
1   me?

2          A.   So if you have policy premiums that were

3   past due five years or more, we couldn't reinstate

4   them, even if was it was a under PUXT.

5          Q.   Paid up extended term.  Okay.

6   (Plaintiff's Exhibit No. 69, December 2013 Email

7   Chain Between Henry Lewer, Toniann Fragala and

8   Others, was marked)

9   BY MS. GUERTIN:

10         Q.   I'm going to show you what has been

11  marked as Exhibit 69.  This is an email chain that

12  is Bates numbered AXA 002559 through 2561.

13            MS. GUERTIN:   And this is under tab 5 in

14  your binder, Carolyn.

15  BY MS. GUERTIN:

16         Q.   Take a minute.  Do you recognize this

17  email chain?

18         A.   Yes.

19         Q.   Okay.  If you look on the second page of

20  the document, there is an email from Henry Lewer.

21  It's the one dated December 23rd, 2013 at 11:17 a.m.

22  Do you see that?

23         A.   Uh-huh.

24         Q.   He is emailing you.  And it says:

25  "Sandra, please submit for scan and initial review
```

OBJECTION
relevance
p. 53:5-56:24

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-5  Filed 06/24/20  Page 54 of 138
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 110 of 122

```
 1          A.    Correct.

 2                MS. GUERTIN:   Okay.  So Robert, just to

 3     clarify, is Hallie Hawkins --

 4                MR. CASSOT:    Yes.

 5                MS. GUERTIN:   She is prepared to talk

 6     about the differences between those two.

 7                MR. CASSOT:    Auto, facultative and

 8     impact of reinsurance.

 9                MS. GUERTIN:   Okay.  On reinstatement.

10     Good.    Thank you.

11     BY MS. GUERTIN:

12          Q.    When you say in this email "APP file,"

13     A-P-P, what does that mean?

14          A.    We order the original application file

15     that we originally received as part of new business

16     in order to look for the reinsurance information,

17     the reinsurance company's name, the reinsurance file

18     number.

19          Q.    I see.  Okay.  Just going back to the

20     previous email that we were looking at from earlier

21     that same day, who tentatively declined the request?

22          A.    The underwriter.

23          Q.    The underwriter Hallie Hawkins?

24          A.    Yes.

25          Q.    And she communicated that to you?
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 81 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 111 of 122

```
1        A.    Yes.

2        Q.    Okay.  Did you have any role in

3   determining whether these policies would be

4   reinstated or not?

5        A.    No.

6   (Plaintiff's Exhibit No. 74, February 2014 Email

7   Chain Between Toniann Fragala, Sandra Huffstetler

8   and Others, was marked)

9   BY MS. GUERTIN:

10       Q.    I'm going to show you what has been

11  marked as Plaintiff's Exhibit 74, which is an email

12  chain Bates numbered AXA 002287 through 2289.  Do

13  you recognize this email --

14       A.    Yes.

15       Q.    -- or these emails?  The email from

16  David Hungerford on the first page to yourself, he

17  says:  "I received a call from Mr. Wiener's office

18  indicating that they were unaware of the medical

19  information submitted by his doctor for the

20  reinsurance and wanted to get a copy of the doctor's

21  notes.  They felt the notes may not reflect

22  Mr. Wiener's true medical condition.  Let me know if

23  you can release them to the insured or owner."  Can

24  you explain what this email meant to you?

25       A.    It sounded like he was wanting us to
```

OBJECTION
relevance, hearsay
p. 81:6-82:11

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 82 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 112 of 122

```
 1   release the medical records that we had obtained for

 2   reinstatement consideration to the client.

 3        Q.   Okay.  His statement about the fact that

 4   they felt the notes might not reflect his true

 5   medical condition, did that impact, to your

 6   knowledge, the assessment of the reinstatement

 7   application?

 8        A.   I don't know.

 9        Q.   Okay.  Did it affect how you handled the

10   processing of the reinstatement?

11        A.   No.

12        Q.   Did you reach out to anyone other than

13   the primary care physician for medical records in

14   this case?

15             MR. CASSOT:  Objection to the form.

16   BY MS. GUERTIN:

17        Q.   Let me rephrase it.  Did you receive

18   medical records from any other doctors for this

19   case?

20        A.   No.

21        Q.   Did you request any medical records for

22   this case?

23        A.   No.

24        Q.   Okay.  Your email in response at the

25   top, you indicate you regret that we would not
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 83 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 113 of 122

```
 1  release these medical records.  What do you mean by

 2  that?

 3       A.   We wouldn't send the medical records

 4  that we had obtained from Dr. Boyd to the client.

 5       Q.   Why not?

 6       A.   Because those were obtained at AXA's

 7  expense for reinstatement consideration.  And that

 8  is something that he can go to his doctor to obtain.

 9       Q.   How did you know that that should be the

10  response?

11       A.   I believe there may be a job aid that

12  says that we don't release medical records.

13       Q.   A job A?

14       A.   Job aid.

15       Q.   Oh.  Job aid.  What is that?  Like a

16  guideline of some sort?

17       A.   Yeah, procedures.

18       Q.   Would you have said this without there

19  being some sort of procedure?

20       A.   I wouldn't have said that unless I knew

21  for sure.

22  (Plaintiff's Exhibit No. 75, 3-5-14 Letters to

23  Malcolm Wiener from Sandra Huffstetler, was marked)

24  BY MS. GUERTIN:

25       Q.   Let me show you what has been marked as
```

OBJECTION
relevance
p. 82:24-83:21

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 84 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 114 of 122

1    reinstatement?

2         A.    I don't recall why I would have sent it.

3         Q.    Were you instructed to send it?

4         A.    No.

5         Q.    Is it part of your job duty to -- job

6    duties to, you know, keep in touch with an agent in

7    a situation like this?

8         A.    Yes.

9         Q.    And do you know who did make the

10   decision?  The underwriter?

11        A.    Yes.

12   (Plaintiff's Exhibit No. 79, Advice Of Underwriting

13   Decision, was marked)

14   BY MS. GUERTIN:

15        Q.    I'm going to show you what has been

16   marked as Exhibit 79.  This is a letter with Bates

17   numbers AXA001023 through 1024.  Do you recognize

18   this letter?

                                    OBJECTION
                                    relevance
19        A.    Yes.                p. 94:15-96:20

20        Q.    What is this?

21        A.    This is the Advice Of Underwriting

22   Decision that is letting the insured know that their

23   reinstatement has been declined.

24        Q.    Do you know who Richard Jaegar, M.D. is?

25        A.    He is one of our medical directors.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 95 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 115 of 122

```
 1         Q.    Do you know what medical directors do?

 2         A.    No.

 3         Q.    Okay.  Did you speak to him at all?

 4         A.    No.

 5         Q.    Do you know why he sent this letter?

 6   Him, specifically, I mean.

 7         A.    He didn't send the letter.  His

 8   signature is on these letters.

 9         Q.    What do you mean by that?

10         A.    Well, I typed the letter up, and his

11   name is embedded in this letter.

12         Q.    Is it like a template letter that you

13   use?

14         A.    Yes.

15         Q.    And you said you typed it?

16         A.    Yes.

17         Q.    Okay.  How did you know what to put in

18   this letter?

19         A.    Well, I put -- the only thing I put in

20   the letter is the insured's information, address,

21   date, insured's name, the application file; that it

22   was a reinstatement, and the specific information

23   received from Dr. Barry Boyd which would have come

24   from the underwriter.

25         Q.    Okay.  So this part that's in italics
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 96 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 116 of 122

1    here is the part that you added to the letter?

2            A.    Yes.

3            Q.    Okay.   And that information came from

4    Hallie Hawkins?

5            A.    Yes.

6            Q.    And was it something that was

7    communicated to you via the AWD system or orally?

8    How did you get that?

9            A.    I don't recall if it was AWD or email or

10   both.

11           Q.    Okay.   And you did not consult with

12   Dr. Jaegar?

13           A.    No.

14           Q.    Is his name on all AUDs?

15           A.    Yeah.   For requests that are declined

16   due to medical reasons, yes.

17   (Plaintiff's Exhibit No. 80, MIB Search Response,

18   was marked)

19   BY MS. GUERTIN:

20           Q.    All right.   I'm going to show you what

21   has been marked as Plaintiff's Exhibit 80.   This is

22   a document Bates numbered AXA000543.   Do you

23   recognize that document?

24           A.    Yes.

25           Q.    What is it?

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 97 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 117 of 122

```
 1          A.    It's an MIB Search Response where we
 2   have gone out to see if there is any MIB codes.
 3          Q.    Did you perform this search?        OBJECTION
                                                      relevance
 4          A.    I don't recall.
 5          Q.    And what does this show?
 6          A.    It shows that there was no MIB for the
 7   information that we entered, the insured's name,
 8   date of birth.
 9          Q.    Okay.  And does the date that appears at
10   the top of the page where it says:  "Confidential -
11   July 22, 2008," is that, to the best of your
12   knowledge, when that search was run?
13          A.    I'm not sure.
14          Q.    Have you ever seen a screen like this
15   before?
16          A.    Uh-huh.
17          Q.    That's a yes?
18          A.    Yes.  I'm sorry.
19          Q.    That's okay.  When we talked earlier
20   about MIB codes and the email -- maybe we should
21   just pull it out, the email where Hallie Hawkins
22   sent you a number of MIB codes --
23          A.    Uh-huh.  Yes.
24          Q.    -- here we go.  That's Exhibit 71.  Is
25   this the screen?  In Exhibit 80, is that what it
```

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 98 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 118 of 122

1    would look like when you were putting those in, or

2    no?

OBJECTION
relevance, foundation

3         A.   No.  Uh-uh.

4         Q.   That's something different?

5         A.   When we enter it, it is different, yeah.

6    This is the result you would get.  That would show

7    these if you got results back (indicating.)

8         Q.   Okay.  Just to clarify, Exhibit 80 would

9    be the result if you inputted -- you might get these

10   MIB codes back as a result of that search?

11        A.   Yes.  Yes.

12             MS. GUERTIN:  Okay.  Why don't we take a

13   short break.

14   (Break In Proceedings)

15   BY MS. GUERTIN:

16        Q.   Just a couple of follow-up questions for

17   you.  Do you know if Dr. Jaegar reviewed this file

18   at all?

19        A.   No.

20        Q.   You don't know?

21        A.   I don't know.

22        Q.   Okay.  And then with respect to Exhibit

23   71 where Hallie Hawkins sent you MIB codes, is it

24   your understanding that these are codes that she

25   generated?

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 99 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 119 of 122

1    A.   Yes.

2    Q.   Okay.  From her review of the records?

3    A.   Yes.

4    Q.   Okay.  And she was asking you to report

5  them to MIB.  Correct?

6    A.   Correct.

7    Q.   Okay.  Is there anything that you did to

8  verify the accuracy of these codes?

9    A.   No.

10   Q.   Okay.  You just took this and inputted

11  it.  Correct?

12   A.   Yes.  Yes.  And we would get an error in

13  the MIB system, on their website, if these codes

14  were not correct; if there was something wrong with

15  them.

16   Q.   Okay.  So do you know the date when you

17  inputted those codes into MIB?

18   A.   No.

19   Q.   Would that be memorialized anywhere?

20   A.   When you get a response back.  I don't

21  remember if I actually captured the screenshot of

22  the MIB when I entered it, the confirmation.

23   Q.   Okay.  If you had captured that

24  screenshot, where would that be?

25   A.   It should be in the AWD case.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-5  Filed 06/24/20  Page 100 of 138
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 120 of 122

1    Q.   Okay.  Do you know if the Reinsurance
2  company would have seen the MIB codes that you
3  inputted into the MIB system?
4    A.   They would not have.
5    Q.   Why not?
6    A.   Because the MIB codes would have been
7  entered after the final decision had been made.
8    Q.   Why is that the case?
9    A.   Because entering the -- because that's
10  the procedure.  The AUD and the MIB codes are the
11  last thing we do before we decline the case in AWD.
12    Q.   Okay.  So you don't enter those codes
13  until the very end, essentially.
14    A.   Correct.
15    Q.   Until after you receive the assessment
16  from Reinsurance, even.
17    A.   Correct.
18    Q.   Okay.  Now, when you say that the system
19  would kick back an inaccurate code to you, you're
20  not saying that it does some sort of medical
21  analysis?
22    A.   No.
23    Q.   Okay.  So it's relying on you or the
24  underwriter and their assessment of the medical
25  conditions.  Correct?

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC  Document 84-5  Filed 06/24/20  Page 103 of 138
Case 3:18-cv-00106-RJC-DSC  Document 111  Filed 08/27/20  Page 121 of 122

1        A.    Correct.

2        Q.    Okay.  It's only verifying if those

3    codes are -- those codes exist somewhere.

4        A.    Correct.

5        Q.    Okay.  And do you know when this -- when

6    this reinstatement application first came in, do you

7    know if there were any MIB codes associated with

8    Malcolm Wiener?

OBJECTION
relevance

9        A.    I don't recall.

10       Q.    Okay.  Is there something you can look

11   at that would tell us if that was the case?

12       A.    You can look in the AWD case.

13       Q.    Not in the notes, but somewhere else?

14       A.    Let's see.  There is no indication of

15   MIB codes.

16       Q.    Okay.  Does it state that there are no

17   MIB codes, or is it just silent on the issue?

18       A.    It's silent on the issue.

19       Q.    Okay.  You mentioned that there is more

20   to the AWD than just these notes.  Correct?

21       A.    Correct.

22             MS. GUERTIN:  Okay.  Can we just go off

23   the record for a second?

24                          (Off-the-record discussion)

25   BY MS. GUERTIN:

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM
Case 3:18-cv-00106-RJC-DSC   Document 84-5   Filed 06/24/20   Page 104 of 138
Case 3:18-cv-00106-RJC-DSC   Document 111   Filed 08/27/20   Page 122 of 122