UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:18-cv-00106-RJC-DSC

| | |
|---|---|
| MALCOLM WIENER, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> )     ORDER <br> AXA EQUITABLE LIFE INSURANCE ) <br> COMPANY, ) <br> ) <br> Defendant. ) <br> ) | |

**THIS MATTER** comes before the Court on Defendant's Motion to Dismiss for Lack of Jurisdiction, to Set Aside the Judgement, to Set Aside the Verdict, and for a New Trial, (Doc. No. 130), Defendant's Memorandum in Support, (Doc. No. 131), Plaintiff's Response in Opposition, (Doc. No. 138), Defendant's Reply, (Doc. No. 140), and Plaintiff's Surreply, (Doc. No. 143).

I.    FACTS

This case was tried to a jury, which ruled for the Plaintiff on common law negligence. The facts recited here, if at all disputed, are taken in a light most favorable to the Plaintiff as the non-moving party.

On December 2, 2013, Defendant AXA Equitable Life Insurance Company ("AXA") notified Plaintiff Malcolm Wiener ("Wiener") that his $16 million life

1

insurance policies had terminated.[1]  (Doc. No. 1-2, at Exs. A–D.)  Later that month Wiener, a Connecticut resident, submitted reinstatement applications to AXA along with the materials required for such applications, including a waiver granting AXA access to all information regarding Wiener's past, present, or future physical or mental conditions.  (Doc. No. 1-2, ¶¶ 26, 46–47; Doc. No. 9, ¶¶ 26, 46–47; Doc. No. 48-1, at Ex. 61.)  Upon reviewing Plaintiff's medical records, AXA underwriter Hallie Hawkins reported to AXA's Charlotte, NC operations center that Wiener had at least six serious medical conditions.[2]  (Doc. No. 1-2, ¶ 29; Doc. No. 9, ¶ 29, Doc. No. 48-1, at Ex. 71.)  Hawkins directed an employee in Charlotte, NC to report the Plaintiff's relevant medical codes denoting these conditions to the Medical Information Bureau ("MIB").  (Id.)

The MIB is a corporation that compiles information about insurance applicants, analogous to a health history credit report.  (Doc. No. 48-5, at 4.)  When an individual applies for life insurance with an MIB member company, the company may disclose the individual's MIB report and medical conditions, if any, to the insurance company evaluating the individual's application.  (Doc. No. 49-5, at 3.)  MIB members must report to MIB any medical impairments and conditions, denoted

---

[1] The termination of the policies is the subject of an earlier filed lawsuit pending in the Southern District of New York.  Wiener v. AXA Equitable Life Insurance Co., No. 1:16-cv-04019-ER.

[2] The six disputed conditions that Hawkins cited were: 1) Atrial Fibrillation.  (Doc. No. 45-7, at 280:18–281:1.) 2) Suspected Cerebral Vascular Accident.  (Doc. No. 45-7, at 283:17–284:8.) 3) High Blood Pressure.  (Doc. No. 45-7, at 280:7–16.) 4) Suspected Memory Loss.  (Doc. No. 45-7, at 284:21–22.) 5) Monoclonal Gammopathy of Uncertain Significance ("MGUS").  (Doc. No. 45-7, at 284:10–13.) 6) Sleep Apnea.  (Doc. No. 45-7, at 283:5–15.)

2

by six-digit "codes", that any underwriter discovers about an individual applying for life insurance. (Doc. No. 45-5, at 13–14; Doc. No. 45-7, at 281:1–2.) Any codes reported by an MIB member about an applicant are maintained in MIB's database, and these codes are available to other MIB members who obtain the applicant's authorization to use the MIB as an information source. (Doc. No. 49-5, at 3.)

Defendant informed Plaintiff on March 24, 2014 that it had declined his applications for life insurance reinstatement. (Doc. No. 1-2, at Ex. E.) Plaintiff then contacted Sanford Robbins of American Business, an insurance brokerage company, who submitted an informal application for life insurance on Plaintiff's behalf to John Hancock, Principal Life Insurance Company, and Security Mutual Life Insurance Company of New York. (See Doc. No. 48-4, at 7:8–19; Doc. No. 48-4, at 20:21–21:3, 23:6–25, 26:25–27:19.) John Hancock reviewed Plaintiff's medical records and declined his application. (Doc. No. 48-4, at 20:24–23:5.) Principal Life Insurance Company reviewed Plaintiff's medical records and tentatively approved his informal application at a Table 4 rating, which is double the standard rate, subject to a full underwriting and MIB check upon receipt of a formal application. (Doc. No. 48-4, at 23:6–24:13.) Unlike John Hancock and Principal Life Insurance Company, Security Mutual obtained and reviewed Plaintiff's MIB file in addition to Plaintiff's medical records, and tentatively approved Plaintiff's application, but did so at a more costly Table 4 rating, whereupon Plaintiff declined to submit additional records or otherwise follow up with the company. (Doc. No. 48-4, at 27:23–28:13, 25:8–20, 28:15–22.) Mr. Robbins testified that some insurance companies had indicated privately that Mr.

3

Wiener's MIB codes had affected their insurance decision. (Doc. No. 122 at 121–124.)

On May 13, 2015, Plaintiff sued Defendant over the termination of the life insurance policies in a case currently before the Southern District of New York, Case No. 1:16-cv-04019-ER. During discovery in that case the Plaintiff discovered that Defendant's North Carolina branch had reported six Plaintiff-related medical codes to the MIB. As a result, Plaintiff filed this separate lawsuit in North Carolina.

## II. PROCEDURAL HISTORY

On January 25, 2018, Plaintiff filed his Complaint in the Superior Court of Mecklenburg County, North Carolina, and Defendant subsequently removed the action to the United States District Court for the Western District of North Carolina. Plaintiff alleged that Defendant failed to exercise reasonable care in assessing Plaintiff's medical history and conditions and reporting such information to the MIB. Plaintiff asserted claims for negligent misrepresentation, libel, negligence, and unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1. (Doc. No. 1.)

On March 12, 2018, Defendant filed to change venue to the Southern District of New York. (Doc. No. 10.) Plaintiff opposed the motion, arguing in part that the actions in question occurred in North Carolina and the relevant law was North Carolina law. (Doc. No. 15.) This Court denied the motion to change venue on February 13, 2019. (Doc. No. 21.)

Trial was initially set for May 4, 2020. (Doc. No. 29.) Prior to trial Defendant filed a Motion for Summary Judgment, seeking to dismiss all claims. (Doc. No. 43.) This Court granted the motion in part and denied the motion in part, dismissing all

4

claims except for the negligence claim. (Doc. No. 63.) Trial was scheduled on the negligence claim. In light of the COVID-19 pandemic this trial was postponed beyond the originally-planned May 4, 2020 date, and ultimately set for September 2020. (Docs. Nos. 56, 86.)

From September 8 to September 10, 2020, this Court held a three-day jury trial on Plaintiff's negligence claim. The jury returned a verdict for Plaintiff on September 10, finding Defendant liable for $16 million of damage but reducing the amount by $8 million based on Plaintiff's own negligence, for a final verdict amount of $8 million in Plaintiff's favor. (Doc. No. 117.)

Following trial Defendant filed an October 8, 2020 motion to dismiss the case for lack of jurisdiction, to set aside the judgment, to set aside the verdict, and to move for a new trial. (Doc. No. 130; see also Docs. Nos. 131, 138, 140, 143.) In this motion, for the first time, Defendant argues that the Court lacked subject-matter jurisdiction to hear this case, (Doc. No. 131 at 1), based upon the North Carolina Consumer and Customer Information Privacy Act. N.C. Gen. Stat. §§ 58-39-5 to -165. That statute, Defendant argues, provides a set of exclusive remedies for the type of violation that Plaintiff alleges, and that these exclusive remedies deprive the Court of subject-matter jurisdiction to hear Plaintiff's common law negligence claim. (Doc. No. 131 at 7–11.) Defendant also argued that the statute provides immunity for people in Defendant's position, further depriving the Court of subject-matter jurisdiction. (Doc. No. 140 at 5.)

Plaintiff replies that the North Carolina statute in question only affects North

Carolina residents, which Plaintiff is not, and elaborates that while Connecticut has a nearly identical statute, Defendant has not provided an argument that any Connecticut statute applies to this case. (Doc. No. 143 at 2.) Plaintiff further argues that even if either statute applies to the case, the statutes do not preclude the remedies that Plaintiff seeks and obtained at trial, and that regardless Plaintiff has presented a legally colorable claim to relief. (Doc. No. 143 at 3–4.)

Defendant's motion to dismiss the case for lack of jurisdiction, to set aside the judgment, to set aside the verdict, and to move for a new trial has been fully briefed and is now ripe for adjudication. Although filed incomprehensibly late, Defendant's argument has merit.[3]

## III. STANDARD OF REVIEW

The existence of subject-matter jurisdiction is a threshold issue a court must address before considering the merits of any case. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88–89 (1998); Jones v. Am. Postal Workers Union, 192 F.3d 417, 422 (4th Cir. 1999). A federal court's subject-matter jurisdiction is limited. Chris v. Tenet, 221 F.3d 648, 655 (4th Cir. 2000). If the Court lacks jurisdiction, it has no authority to hear any part of the case. Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). Lack of subject-matter jurisdiction "may be raised at any time. Thus, a party, after losing at trial, may move

---

[3] "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." Henslee v. Union Planters Nat. Bank & Tr. Co., 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).

6

to dismiss the case because the trial court lacked subject-matter jurisdiction." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434–35 (2011) (citing Arbaugh v. Y&H Corp., 546 U.S. 500 (2006)). Even when none of the parties have raised the issue, "[c]ourts have an independent obligation to determine whether subject-matter jurisdiction exists . . . ." Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010). "Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt." Ashcroft v. Iqbal, 556 U.S. 662, 671 (2009). Furthermore, the party seeking federal jurisdiction has the burden of proving that subject-matter jurisdiction exists. Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).

## IV. DISCUSSION

Defendant for the first time raises two nearly identical statutes in different states, arguing that whichever statute applies would provide the exclusive remedy for Plaintiff's negligence claim and deprive this Court of jurisdiction over the same. If this Court does indeed lack subject-matter jurisdiction then it would lack the authority to adjudicate this case – even post-trial. Fed. R. Civ. P. 12(h)(3); Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434–35 (2011). Therefore, despite the prior jury verdict, this Court must evaluate the jurisdiction question.

### A. Choice of Law

Plaintiff in this case alleges that the Defendant's North Carolina branch negligently reported inaccurate medical information about Plaintiff to the MIB. (Docs. Nos. 1-2, 27.) Prior to Defendant's October 8, 2020 filing, the parties did not

7

dispute that North Carolina law governed this negligence claim. (See Docs. Nos. 15, 16.)  However, given the newly raised possibility that Connecticut law rather than North Carolina law applies here, (Doc. No. 140 at 4), this Court will undertake a choice of law analysis.

"A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits."  Perini/Tompkins Joint Venture v. Ace Am. Ins. Co., 738 F.3d 95, 100 (4th Cir. 2013).  This Court sits in North Carolina, and therefore must apply North Carolina choice of law doctrine.  North Carolina law requires that rules of *lex loci delecti commissi*, 'the law of the place where the offense was committed,' determine which state's law applies in tort actions.  Boudreau v. Baughman, 322 N.C. 331, 335 (1988).  "Under this principle, the law of the case is not drawn from the place where the alleged negligence occurred, but from the state where the last event necessary to make an actor liable for an alleged tort takes place."  Millers Mut. Ins. Ass'n of Ill. v. S. Ry. Corp., 483 F.2d 1044, 1046–47 (4th Cir. 1973) (citing Restatement of the Conflict of Laws § 377 (1934)).  "Injury being the last element of a tort, North Carolina rule, in a nutshell, is the law of the place of injury."  Santana, Inc. v. Levi Strauss & Co., 674 F.2d 269, 272 (4th Cir. 1982).

The question is where the injury to this Plaintiff occurred.  The injury location is often easy to determine, especially in cases involving physical injury.  See, e.g., Mooney v. Wood/Chuck Chipper Corp., 2000 WL 33422744 (W.D.N.C. Feb. 4, 2000); Boudreau v. Baughman, 322 N.C. 331 (1988).  However, here the Plaintiff alleges that his injury is his inability to obtain insurance.  The location of such an injury is

8

less intuitively obvious.

In analogous cases courts have found that the place of injury is the state in which the injury itself was felt, rather than the state in which the injurious act occurred. For example, after a Florida Plaintiff lost a life insurance policy due to a Defendant's negligence, an Indiana federal court determined that the place of the economic injury had been the state in which Plaintiff resided, rather than the state in which the negligent act had occurred. Coldren v. Am. Gen. Life Ins. Co., 2012 WL 6045592 at *4 (S.D. Ind. Dec. 5, 2012). The law of defamation provides an analogous field in which to flesh out the contours of *lex loci delicti commissi*. Courts have repeatedly found that the place of injury is the state in which defamation is injuriously heard rather than necessarily the state in which the defamatory remarks were made. Ascend Health Corp. v. Wells, 2013 WL 1010589 at *2 (E.D.N.C. Mar. 14, 2013) (applying Texas law after a defamatory statement written online in North Carolina injured a Texas company); Castro v. Goggins, 2016 WL 7217282 at *1 (M.D.N.C. Dec. 12, 2016), report and recommendation adopted sub nom. Castro v. Coggins, 2017 WL 5749731 (M.D.N.C. Jan. 10, 2017); Nobles v. Boyd, 2015 WL 2165962 at *5 (E.D.N.C. May 8, 2015). Courts have also found that the place of injury in fraudulent misrepresentation cases is the place in which the misrepresentation was heard and relied upon – that is, not necessarily where the fraudulent statement was spoken, but where the Court determines the injurious effect occurred. M-Tek Kiosk, Inc. v. Clayton, 2016 WL 2997505 at *14 (M.D.N.C. May 23, 2016); see also Giri v. Integrated Lab. Sys., Inc., 2019 WL 489104 at *4 (E.D.N.C. Feb. 7, 2019).

Finding that these principles apply here, this Court concludes that the state in which Plaintiff's injury occurred was the state in which the Plaintiff received the injurious effect of Defendant's negligent MIB code reporting, rather than the state from which Defendant reported those codes. Plaintiff alleges that his injury – caused by Defendant's report of codes to the MIB – was Plaintiff's inability to obtain life insurance from any insurance company. (Doc. No. 80 at 16.) For *lex loci* purposes, this injury did not occur in the state where the MIB was located, nor in the states from which the insurance companies allegedly viewed these codes. Neither the reporting nor the viewing of these codes constituted the final step constituting Plaintiff's injury, because at their completion Plaintiff himself had not yet actually received the injury in question. Instead, injury occurred in Plaintiff's state of residence at the time that he became prospectively unable to receive insurance, and in which Plaintiff otherwise would have received insurance but for Defendant's negligence. Plaintiff's state of residence at the time of injury was Connecticut. Therefore, as the place in which Plaintiff received his injury, Connecticut is the state in which "the last event necessary to make an actor liable for an alleged tort [took] place." Millers Mut. Ins. Ass'n, 483 F.2d at 1046–47. Connecticut law applies to the case at bar.

### B. Connecticut Insurance Information Law

Connecticut law includes the Connecticut Insurance Information and Privacy Act (CIIPA), Conn. Gen. Stat. Ann. § 38a-975 et seq., based on the National Association of Insurance Commissioners' (NAIC's) Insurance Information and

10

Privacy Protection Model Act.[4] The CIIPA sets rules and regulations for the collection and use of information related to insurance transactions, providing policyholders with avenues to discover the reasons behind insurance companies' underwriting decisions. See Conn. Gen. Stat. Ann. § 38a-975 et seq. The Act also establishes remedies for violations of its provisions and, critically, provides that these remedies are exclusive of any other potential remedies for such violations. Conn. Gen. Stat. Ann. § 38a-995(e) ("Except as specifically provided in this section, there shall be no remedy to individuals, in law or equity, for occurrences constituting a violation of any provision of sections 38a-975 to 38a-998, inclusive."). The statute's phrase "[e]xcept as" followed by "there shall be no remedy" are all words of exclusivity.

Plaintiff's theory of liability in this case, and the theory on which the jury awarded Plaintiff with damages, is that Defendant negligently reported codes to the MIB, violating its "duty to exercise reasonable care owed to Plaintiff in Defendant's review, assessment, reporting and subsequent publishing of Plaintiff's private health information." (Doc. No. 1-2 at 10.) Such a violation falls squarely within the purview of the Connecticut Insurance Information and Privacy Protection Act. Conn. Gen. Stat. Ann. § 38a-976, -988. By providing comprehensive rules regarding the disclosure and use of medical information in the insurance context, including prohibiting insurance companies from disclosing such information for any reason other than a specific list of exceptions, the CIIPA fully encompasses Plaintiff's claim

---

[4] The North Carolina Consumer and Customer Information Privacy Act., N.C. Gen. Stat. §§ 58-39-5 to -165, is based on the same Model Act.

that Defendant negligently reported Plaintiff's medical information to an insurance information company. Id.; see, e.g., Negri v. Murphy, 2016 WL 402262 at *4 (Conn. Super. Ct. Jan. 8, 2016) ("plaintiff's negligent supervision claim arises out of the service of alcohol and, therefore, the Dram Shop Act is the exclusive remedy") (dismissing negligence claim for lack of subject-matter jurisdiction). The provisions of the CIIPA therefore govern Plaintiff's negligence claim.

The CIIPA's applicability to the facts at issue here is relevant because the Act provides exclusive remedies for any violations of the rules it proscribes. Specifically, Section 38a-995 reads:

> *Individual remedies.*
>
> (a) If an insurance institution, agent or insurance-support organization fails to comply with section 38a-983, 38a-984 or 38a-985 with respect to the rights granted under those sections, any person whose rights are violated may bring an action for equitable relief.
>
> (b) An insurance institution, agent or insurance-support organization that discloses information in violation of section 38a-988 shall be liable for damages sustained by the individual concerning whom the information relates, except that no individual shall be entitled to a monetary award that exceeds the actual damages sustained by such individual as a result of a violation of section 38a-988.
>
> (c) In any action brought pursuant to this section, the court may award costs and reasonable attorney's fees to the prevailing party.
>
> (d) No action under this section shall be brought but within two years from the date the alleged violation is or should have been discovered.
>
> (e) Except as specifically provided in this section, there shall be no remedy available to individuals, in law or in equity, for occurrences constituting a violation of any provision of sections 38a-975 to 38a-998, inclusive.

This list of enumerated remedies is clearly exclusive, as there shall be "no remedies

12

available" for any violations of the provisions of the bill except as provided in this section. Conn. Gen. Stat. Ann. § 38a-995(e). The remedies section thereby excludes the possibility of a general common law claim under the facts that Plaintiff alleged. This section theoretically provides the possibility that the Plaintiff could seek remedies under the statute, and Sec. 995(b) refers to remedies for violations of Sec. 988, which in turn governs disclosure of personal information. However, in this case Plaintiff did not bring the action pursuant to the CIIPA, nor did Plaintiff explain why Defendant's actions did not fall into one of the statutory exceptions; instead, Plaintiff brought only a common law negligence claim against Defendant. The CIIPA's exclusive remedies preclude Plaintiff's claim.

The remaining question is whether this statutory preclusion of Plaintiff's cause of action deprives this Court of subject-matter jurisdiction over Plaintiff's claim. Unfortunately for Plaintiff, it does. While this issue has not been litigated under the CIIPA in particular, a review of Connecticut cases shows that when state or federal laws exclude common law remedies, this exclusion deprives courts of subject-matter jurisdiction over such common law claims within the space that the law occupies. See, e.g., Parmenter v. Wal Mart Stores, E., L.P., 2007 WL 2071625 at *9 (D. Conn. July 16, 2007) ("The legislature, through its enactment of § 31–51m, has granted employees discriminated against or terminated on account of whistleblowing a statutory cause of action. As such, any common law wrongful termination claim based on that whistleblowing conduct is preempted; the court is without jurisdiction to hear such common law claims."); see also Calderon v. Symeon, 2007 WL 2439445 at *4 (D.

13

Conn. June 18, 2007) ("The Connecticut Supreme Court has consistently interpreted the exclusivity provision of the Workers' Compensation Act as a total bar to common-law actions brought by employees against employers for job related injuries") (dismissing for lack of subject-matter jurisdiction); Dominguez v. United States, 963 F. Supp. 2d 107, 124 (D. Conn. 2013) ("this Court thus lacks jurisdiction to hear Dominguez's claim as her sole recourse is compensation pursuant to 18 U.S.C. § 4126 and the regulations promulgated thereunder") (dismissing negligence action against the United States for lack of subject-matter jurisdiction); Mathirampuzha v. Potter, 548 F.3d 70, 81 (2d Cir. 2008) ("Because the FECA is an "exclusive" remedy . . . it deprives federal courts of subject-matter jurisdiction to adjudicate claims brought under the FTCA for workplace injuries that are covered by the FECA").

Plaintiff argues that the statutory preclusion of his common law negligence claim is a failing that implicates the merits rather than jurisdiction. In support of this argument, Plaintiff points primarily to the Supreme Court's statement in Steel Co. v. Citizens for a Better Environment that "[i]t is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the courts' statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998). However, this statement appears in the context of federal question jurisdiction, as the Court extrapolated two sentences later that "the district court has jurisdiction if 'the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be

14

defeated if they are given another'" assuming the claim is not frivolous. Id. (citing Bell v. Hood, 327 U.S. 678, 682 (1946)). By this Court's reading, the portion of Steel Co. quoted by Plaintiff is not a sweeping pronouncement that subject-matter jurisdiction is never implicated so long as a Plaintiff has brought a non-frivolous claim. Rather, it appears the Supreme Court was explaining that federal courts do not lose federal question subject-matter jurisdiction over a case merely because a plaintiff's interpretation of the federal law ultimately turns out to be incorrect, and that instead federal question subject-matter jurisdiction is maintained so long as the interpretation of federal law is determinative.

By contrast, this case does not involve competing interpretations of the Constitution or a federal statute, and is not a case that involves federal question subject-matter jurisdiction at all. The case at bar instead is one in which no parties appear to have been aware of an on-point state law containing exclusive remedies until after the parties had taken the case to trial. Under such circumstances, this Court does not have jurisdiction to hear a common law claim that is precluded by the state law in question. See, e.g., Parmenter v. Wal Mart Stores, E., L.P., 2007 WL 2071625 at *9 (D. Conn. July 16, 2007); Burnham v. Karl & Gelb, P.C., 252 Conn. 153, 161–62 (2000); Negri v. Murphy, 2016 WL 402262 at *4 (Conn. Super. Ct. Jan. 8, 2016).

This Court comes reluctantly to the finding of lack of subject-matter jurisdiction. In doing so it sets aside a jury verdict, something it is usually loath to do. Additionally, the Court recognizes the fine work of Plaintiff's counsel who well-

15

tried a case to jury verdict in the midst of a pandemic, and with considerable cost of time, energy, and resources that could have been devoted to other causes. The same can be said for the parties, other lawyers, jurors, and Court personnel. This post-verdict finding negates all of that effort, but does so in faithfulness to the law as understood by this Court. The Court has no jurisdiction over Plaintiff's claim. The case is dismissed.

## V. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss for Lack of Jurisdiction, to Set Aside the Judgement, to Set Aside the Verdict, and for a New Trial, (Doc. No. 130), is **GRANTED** as to the Motion to Dismiss for Lack of Jurisdiction, without reaching Defendant's remaining motions. The clerk is directed to dismiss the case.

**SO ORDERED.**

Signed: February 19, 2021

Robert J. Conrad, Jr.
United States District Judge